BARBARA M. BUMP & another[1] *vs.* ROBERT ROBBINS & others.[2]

Plymouth. March 11, 1987. — June 11, 1987.

Present: GRANT, KAPLAN, & FINE, JJ.

*Contract,* With broker, Performance and breach. *Broker,* Commission.
*Estoppel. Unlawful Interference. Consumer Protection Act,* Unfair act
or practice, Wilful or knowing violation, Damages. *Corporation,* Cor-
porate entity. *Damages,* Consumer protection case.

At the trial of a business broker's common law claims arising out of a series
of oral and written communications between him and the potential seller
of the controlling interest in a corporation, the evidence, viewed in the
light most favorable to the broker, was insufficient to warrant the jury
in finding that the parties had, either by their words or conduct, entered
into an exclusive brokerage agreement under which the seller would
have been required to pay a commission to the broker even if a sale of
stock were arranged without the broker's participation. [303-305]
At the trial of a broker's common law claims arising out of a series of oral
and written communications between him and the potential seller of the
controlling interest in a corporation, the evidence did not warrant a
finding that the broker had performed services for the seller in reasonable
reliance on the seller's alleged promise to create an exclusive brokerage.
[306]
At the trial of common law claims arising out of a series of oral and written
communications which allegedly culminated in a brokerage agreement
between a broker and the potential seller of the controlling interest in a
corporation, the evidence was insufficient to warrant the judge in submit-
ting to the jury the issue whether the agreement had been terminated in
bad faith, where there was no basis for a finding that the broker had
produced a customer ready, willing, and able to purchase the seller's
interest on acceptable terms or that the seller was attempting to take
advantage of the broker's efforts without paying him a commission.
[306-308]

---

[1] Cynthia B. Neusbaum. These coexecutors of the will of Morrison M.
Bump were substituted as plaintiffs when Bump died in 1984 after the jury
trial and prior to the trial of the G. L. c. 93A claims.

[2] LRC, Inc., and Microwave Research Corp.

A corporation which bought the controlling interest in another corporation directly from the seller, at a time when a broker was actively promoting the sale, was not liable to the broker on a claim of intentional interference with beneficial contractual relations, where the evidence failed to show either that the buyer was aware of an alleged brokerage agreement between the broker and the seller or that the broker, not having produced a suitable buyer through his own efforts, was actually damaged, and where the buyer's conduct had not been contrary to ordinary business practices and expectations. [308-309]

At the trial of a business broker's claims under G. L. c. 93A, the Consumer Protection Act, the judge, as trier of fact, was warranted in finding that the broker had suffered losses resulting from misrepresentations and concealment of material facts by the potential seller of the controlling interest in a corporation, and that the seller's conduct, which misled the broker as to the corporation's financial soundness, constituted unfair or deceptive acts in a business context. [310-312]

On remand of an action on a business broker's claims arising out of his dealings with the seller of the controlling interest in a corporation, the judge was to redetermine the amount of the plaintiffs' recovery on their claims under G. L. c. 93A, in light of the fact that jury verdicts in their favor on their common law claims were set aside on appeal, was to consider whether an award of multiple damages was appropriate, and was to revise his award of counsel fees and costs. [312-313]

At the time of conduct giving rise to a business broker's claims against them under G. L. c. 93A, two corporations were being operated in such close affiliation that, in the circumstances, one of the corporations was liable on agency principles for the unfair or deceptive acts of the other. [313-316]

CIVIL ACTION commenced in the Superior Court on March 25, 1977.

The case was tried before *George N. Hurd, Jr.,* J.

*Jane S. Schacter* for Robert Robbins.

*Carmine W. DiAdamo* for Microwave Research Corp.

*Wm. Shaw McDermott & Mitchell J. Sikora, Jr.,* for the plaintiffs.

*Carl L. Croce,* for LRC, Inc., was present but did not argue.

FINE, J. After a bifurcated trial in the Superior Court of common law contract and tort claims before a jury, and, four years later, G. L. c. 93A claims before the judge who had presided over the jury trial, judgment entered awarding money damages to Morrison M. Bump, a business broker, against all

three defendants, LRC, Inc. (LRC), Robert Robbins, its president and principal shareholder, and Microwave Research Corp. (MRC). Bump's claims arose out of the following circumstances: a series of communications, oral and written, between Bump and Robbins which, Bump alleges, resulted in the formation of an exclusive brokerage agreement for the sale of LRC; the sale by Robbins of his LRC stock to MRC without any assistance from Bump but after Bump had undertaken efforts to sell LRC to another party; and the failure of Robbins, LRC, or MRC to pay Bump a commission. Bump based his claims on the alleged exclusive brokerage contract, quantum meruit, interference with advantageous contractual relations, and G. L. c. 93A, § 11. In addition, he sought recovery against MRC on the theory that MRC was responsible for any liability imposed against LRC because MRC was an undisclosed principal of Robbins and LRC or because a "de facto merger" had occurred between LRC and MRC.

We hold that directed verdicts, sought at the appropriate times by all three defendants on all the common law claims, should have been allowed. We hold further that the judge's decision in favor of Bump against both LRC and MRC on the G. L. c. 93A claims is supported by the record. It is necessary for us to remand the G. L. c. 93A portion of the case, however, for a determination of damages.

A. *The Jury Trial.*

Only Bump presented evidence at the jury trial. It consisted of the following. On July 24, 1975, Bump wrote to Robbins offering his services as a broker for the sale of LRC, a New Hampshire company which produced microelectronic products. Bump indicated in his letter that any brokerage fees would be charged to the buyer, but he asked Robbins to agree to negotiate payment of the fees with any prospective purchaser. Robbins responded on July 30, 1975, by sending Bump literature about the company and expressing interest in talking further. Bump immediately acknowledged receipt of Robbins' letter. In mid-August, 1975, Bump travelled from his home in Massachusetts to meet Robbins at LRC headquarters in New Hampshire. They discussed LRC's financial status and a proposed selling price

in the range of $1,000,000 to $1,500,000. They reached no
agreement, however, as to Bump's services. Robbins indicated
that he would not consider hiring Bump until after LRC's 1975
audit.

Bump became ill during the fall of 1975, and there was no
further contact between Bump and Robbins until January 13,
1976, when Bump wrote to Robbins inquiring about LRC's
1975 audit and requesting brochures about the company. On
January 22, 1976, Bump responded to a blind newspaper ad-
vertisement expressing interest in the acquisition of electronics
firms. D. David Cohen, an attorney in New York and the
source of the advertisement, in turn communicated with Bump.
On January 29, 1976, Bump informed Robbins about this pos-
sible lead. Bump and Robbins met at LRC on February 10,
1976. After discussing the history and financial outlook of
LRC, Robbins, on behalf of LRC, authorized Bump to pursue
his contacts with potential buyers. They clarified Bump's fee
schedule (five percent on the first million dollars of the sale
price, two and one-half percent on the second, and one percent
on anything above that amount) and they discussed other mat-
ters, including the need to formalize their understanding. The
next day Bump sent Robbins a letter "as confirmation of [their]
discussion." After cordialities, the letter stated: "I am enclosing
a second copy of this letter. It is my hope that you will sign
this second copy and return it to me for my records — as
confirmation of our discussion and understandings developed
yesterday." The letter then summarized the matters previously
discussed: Robbins' objective that LRC be acquired; the agree-
ment that Bump would represent LRC as a business broker;
and their understanding about payment of fees. Bump stated
what his responsibilities would be: "I will seek buyers, both
direct and through other brokers and third persons with whom
I work. I will share my fees with them. You will have advance
approval of the names of all buyers I approach, and also of
written descriptive materials I use, regarding LRC. I will keep
you informed of my activities through phone calls, memos,
and copies of letters, where applicable." Bump then added
several provisions which he acknowledged he and Robbins had

*not* discussed, but which he included "in the hope" that Robbins would approve. Included among those provisions were the following:

> "As you approve each name of a buyer to be approached, you will protect me in the matter of fees for a period of two years from such date. This means that should you make a deal with such a buyer, either direct or through another broker or 'third person' during that two years, I am protected. By 'making a deal', I mean a preliminary agreement within the time period, even if final papers don't pass until later.
>
> "During the period we work together, you will turn all inquiries that come to you direct or through other 'third persons' over to me for handling, in cooperation with you.
>
> "Either of us may cancel this agreement or understanding by notifying the other, with sixty days notice. Such cancellation would not relieve either of us from responsibility that clearly goes beyond the matter of representation in seeking a merger partner for you . . . ."

At the end of the letter, after the word "agreed", there was a blank space for Robbins to insert his signature, and also a reply-o-gram. Robbins never signed or returned the letter or reply-o-gram, and the letter was not later discussed.

The only subsequent contacts between Bump and Robbins in the period from January through April of 1976 were: 1) Bump prepared a "profile" of LRC which he sent to Robbins, and Robbins approved it; 2) Bump had a telephone conversation with Robbins during which Bump told Robbins about Vernitron, the potential buyer represented by Mr. Cohen, and Robbins expressed enthusiastic interest in the possibility of a sale to Vernitron; and 3) Bump forwarded correspondence to Robbins about his contacts during March with Vernitron and its interest in LRC. At no time did Robbins discourage these efforts.

Bump was in contact with Mr. Cohen and Vernitron throughout the period from January through April, 1976. Vernitron informed Bump on March 17, 1976, that "the situation would *not* (emphasis original) be of current interest to Vernitron"

unless LRC met certain conditions. Continued interest was expressed in the acquisition, however, and Cohen asked Bump to arrange a visit in May to LRC. When Bump called LRC to arrange the visit on April 22, 1976, he learned for the first time that LRC might no longer be for sale. Bump thereupon ceased his efforts with Vernitron.

In fact, commencing in early 1975, Robbins had been involved in negotiations about the possible merger of LRC and MRC, a Massachusetts company engaged in the business of producing microwave components. The negotiations continued into the early months of 1976 on an almost daily basis. On June 24, 1975, MRC's board of directors authorized the purchase of 80% of LRC stock. Robbins owned 80% of the stock; his wife owned the remainder. On July 1, 1975, the LRC directors consented to a transfer of 80% of the company's stock to MRC. MRC and Robbins signed a "Preliminary Agreement" which, although dated July 2, 1975, for tax purposes,[3] was actually signed in March or April, 1976. It provided for the transfer of 80% of LRC stock to MRC for $1.00. About the same time, MRC assented to an employment agreement between Robbins and LRC providing for an annual salary of $35,000 for ten years, guaranteed by MRC, and other benefits. Theodore S. Raphael, Bump's accountant, testified that although the named consideration was only $1.00, Robbins actually received benefits from MRC worth $395,397 in exchange for his stock. In addition, various mutual business arrangements were made by LRC and MRC in 1975 and 1976, including the leasing of LRC space by MRC in 1975. Bump was rebuffed in his efforts to have Robbins or MRC pay him a commission on the sale of Robbins' stock to MRC.

Directed verdict motions were made by all parties and, except for a claim based on quantum meruit,[4] the motions were de-

---

[3] MRC's tax return for 1975 indicated it had acquired the LRC stock on July 1 1975. That way, MRC obtained tax benefits for 1975 as result of LRC's losses.

[4] There is no appeal from the allowance of the motion for directed verdict on the quantum meruit claim.

nied.[5] The case was presented to the jury on special questions which were answered as follows: "1. Did Robert Robbins enter into a brokerage agreement with Morrison M. Bump? Answer: Yes. 2. Was Morrison M. Bump exclusively entitled to a commission on any sale of stock, acquisition or merger of LRC, Inc. regardless of whether or not he procured a buyer ready, willing and able to purchase? Answer: Yes. 3. What amount in money, if any, is Morrison M. Bump entitled to as a commission? Answer: zero. 4. Was Morrison M. Bump prevented from performing the brokerage agreement by reason of actions which constituted acts of bad faith by Robert Robbins? Answer: Yes. 5. Please state the amount of money, if any, owed Morrison M. Bump by reason of the revocation in bad faith by Robert Robbins of the brokerage agreement. Answer: $15,000. 6. Did LRC, Inc. enter into an exclusive brokerage agreement with Morrison M. Bump? Answer: Yes. 7. Was Morrison M. Bump exclusively entitled to a commission on any sale of stock, acquisition or merger of LRC Inc. regardless of whether or not he procured a buyer ready, willing and able to purchase? Answer: Yes 8. What amount in money, if any, is Morrison M. Bump entitled to as a commission? Answer: zero. 9. Was Morrison M. Bump prevented from performing his brokerage agreement by reason of actions which constituted acts of bad faith by LRC, Inc.? Answer: Yes. 10. Please state the amount of money, if any, owed Morrison M. Bump by reason of the revocation in bad faith by LRC, Inc. of the brokerage agreement. Answer: $15,525. 11. Did Robert Robbins intentionally interfere with the contractual relationship, if any, between LRC, Inc. and Morrison M. Bump? Answer: Yes. 12. If your answer to Question 11 is "yes", please state in money the damages, if any, sustained by Morrison M. Bump. Answer: zero. 13. Did Microwave intentionally interfere with the contractual relationship, if any, between LRC, Inc. and Morrison M. Bump? Answer: Yes. 14. If your answer to Ques-

---

[5] All the defendants filed posttrial motions for judgment notwithstanding the verdict and for a new trial. After judgment on all claims entered in September, 1985, these motions were denied.

tion 13 is 'yes', please state in money the damages, if any, sustained by Morrison M. Bump. Answer: $93,750. 15. Do you find that there was a *de facto* merger between LRC, Inc. and Microwave Research Corp., Inc.? Answer: Yes."

The judge withheld entry of judgment on the jury's findings pending trial of the G. L. c. 93A claims. Eventually judgment entered, based on the jury verdicts, against Robbins in the amount of $15,000, against LRC in the amount of $15,525, and against MCR in the amount of $109,275. The appeals challenge the admission of certain evidence, the jury instructions, and the sufficiency of the evidence to support the jury verdicts in Bump's favor. Because we view the evidence, construed in a light most favorable to Bump, as insufficient to support any of the awards, we limit our discussion to the sufficiency of the evidence.

1. *The nature of the agreement.* Bump alleged that he had an exclusive brokerage agreement for the sale of LRC. The jury in answers to special questions found an exclusive brokerage agreement, but they did not find that Bump was entitled to a commission. Affecting both theories on which the jury awarded damages, bad faith revocation of the brokerage agreement and interference with contractual relations, however, is the exclusive or nonexclusive nature of the relationship established between Bump and Robbins.

In the ordinary brokerage situation, the broker is entitled to a commission only if he is the efficient or predominating cause of a sale of the property. See *Kacavas* v. *Diamond,* 303 Mass. 88, 91 (1939). Parties are free, however, to agree to different terms, including terms making the brokerage agreement exclusive. See *Kacavas* v. *Diamond,* 303 Mass. at 91; *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. 392, 395 (1985). The effect of an exclusive brokerage has been adjudicated in a number of Massachusetts cases, none recent. See *Des Rivieres* v. *Sullivan,* 247 Mass. 443, 446-447 (1924); *Bartlett* v. *Keith,* 325 Mass. 265, 267 (1950); *Lattuca* v. *Cusolito,* 343 Mass. 747, 751-752 (1962). In general, those cases hold that, if supported by consideration, an agreement for an exclusive brokerage is bilateral and irrevocable during

its stated term; if without consideration, it is a unilateral promise to pay a commission if the property is sold during the stated term, it may be revoked prior to a sale, and a sale by the owner would constitute revocation. Unquestionably, parties are free to agree to the type of arrangement Bump alleges he had, that is, one whereby Robbins, on behalf of LRC, obligated it to pay a commission even if, during a fixed period, Robbins sold the property himself.[6] Such agreements at the present time are not uncommon.

To create an exclusive brokerage, particularly one under which the owner must pay a commission if, within the fixed term, the owner himself sells the property, the parties must expressly and unambiguously indicate such an intent in the contract. See *Currier* v. *Kosinski,* 24 Mass. App. Ct. 106, 107 (1987); *Bourgoin* v. *Fortier,* 310 A.2d 618, 620 (Me. 1973); *Dorman Realty & Ins. Co.* v. *Stalvey,* 264 S.C. 94, 98-99 (1975). Compare *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. at 395. Assuming that the language used in Bump's February 11, 1976, letter to Robbins would, if accepted, have created an exclusive brokerage agreement requiring payment of a commission even if Robbins were to arrange a sale of LRC without the participation of Bump,[7] the

---

[6] This would amount to an exclusive right of sale. The cases have distinguished between an exclusive listing authority or agency, on the one hand, and an exclusive right of sale, on the other. See *Des Rivieres* v. *Sullivan,* 247 Mass. at 447; *Bartlett* v. *Keith,* 325 Mass. at 267. Only under the latter arrangement would an owner be liable for a commission on a sale he made himself without assistance from the broker. See *Bourgoin* v. *Fortier,* 310 A.2d at 620; *Brown* v. *Miller,* 45 Ill. App. 3d 970 (1977). Bump in essence maintains that he was given an exclusive right of sale.

[7] It is not altogether clear under the early Massachusetts cases to which we have referred that the language in the letter would have had that effect. The word "exclusive" was not used, and there was no specific mention in the letter of the consequences of a sale of LRC by Robbins. The proposed additional provisions in the letter did state, however, that Bump's fees would be protected for two years in the event of a sale through another broker or third person and that during the two-year period, Robbins would turn over to Bump "for handling" all inquiries coming to Robbins. If separate consideration for the creation of such an arrangement remains a requirement, there is a question whether Bump's undertaking to "seek buyers both direct and through other brokers. . .," to give Robbins the right to approve buyers

evidence, viewed in a light most favorable to Bump, was insufficient to warrant the jury in finding that Robbins, on behalf of LRC, had accepted that arrangement.

There was no evidence that Robbins, by words, or conduct, manifested his intent to be bound by the additional terms to which Bump stated he "hope[d]" Robbins would agree. The proposal for an exclusive brokerage was merely an offer which Robbins could accept or reject. It is undisputed that Robbins never indicated his assent in the manner called for by the offer, that is, by signing in the space designated for his signature, or by expressly responding in any other way. Exclusivity was never even mentioned in any discussion between the parties.

Robbins' silence and subsequent conduct, in light of the over-all relationship of the parties and the nature of an exclusive brokerage agreement, could not reasonably be viewed as sufficient to create the alleged exclusive agreement. It is true that silence in certain circumstances may constitute acceptance of a contract. Where there is a history of dealing between the parties, and the circumstances are such that silence of a party can reasonably be regarded as the equivalent of acceptance, a contract may be formed, regardless of the silent party's actual state of mind. See *Hobbs* v. *Massasoit Whip Co.,* 158 Mass. 194, 197 (1893). There were no prior dealings, however, between Bump and Robbins. Even without a history of prior dealings, silence, in conjunction with acceptance of valuable services performed by another may be the basis for a finding of an agreement to pay for the services when the beneficiary knows, or in the circumstances ought to know, that the person providing the services expects to be paid for them. See *Day* v. *Caton,* 119 Mass. 513 (1876). Brokerage contracts, however, by their very nature, entail a high risk of noncompensation. See *Hunneman & Co.* v. *LoPresti,* 394 Mass. 406, 409 (1985). It is not at all uncommon for a broker to perform services for which he is not compensated.

---

to be approached, and to keep Robbins informed of Bump's activities, is sufficient to make the agreement an enforceable bilateral one which is irrevocable for the stated term.

There is also no basis in the facts for a finding of promissory estoppel, a theory presented to the jury. See *Loranger Construction Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 760-761 (1978); *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 727-728 (1974), *S.C.*, 368 Mass. 811 (1975); Restatement (Second) of Contracts § 90 (1981). The jury were not warranted in finding that Bump performed services in reasonable reliance on the alleged promise to create an exclusive brokerage. It would have been of profound importance to the parties to know whether they were making an agreement such as the one Bump alleges. Yet exclusivity was never mentioned except, obliquely, in the February 11, 1976, letter. In that letter, Bump specified the form in which he expected Robbins to respond, and no such response was forthcoming. The subsequent contacts between Bump and Robbins were very limited. What did occur between them after the letter was consistent with the creation of the ordinary brokerage agreement which Robbins and Bump had discussed and Bump then confirmed in writing. Bump could not reasonably have had more than a hope that the arrangement would be regarded as an exclusive brokerage. Nor would a finding have been warranted that Bump relied on the actions of Robbins to his detriment. There is no basis for assuming that Bump would not have taken exactly the same steps with Cohen and Vernitron in the hope of earning a substantial commission if the arrangement was one for an ordinary brokerage as he took in a belief that it would be exclusive.

*2. Revocation in bad faith.* Absent special terms in a nonexclusive brokerage agreement, a broker is not entitled to a commission unless " '(a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner . . . . and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract . . . . On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid' [citation omitted]." *Tristram's Landing, Inc.* v. *Wait,* 367 Mass. 622, 629 (1975). Bump concedes that he did not meet the three conditions for

recovery under the first part of the test[8] but asserts as a basis for his claim of bad faith revocation that as he was approaching success in his efforts with Vernitron, he had the rug pulled out from under him by Robbins' sale of his LRC stock to MRC. Bump's position on appeal, therefore, is that he is entitled to a commisison, measured by the value of the proceeds of the sale of LRC stock to MRC.

There are two lines of authority relevant to Bump's claim of bad faith revocation. The first is based on the notion that the *Tristram's Landing* requirement of a completed transaction is not applicable where a seller wrongfully defaults. See *Tristram's Landing,* 367 Mass. at 629; *Lewis* v. *Emerson,* 391 Mass. 517, 524 (1984); *Capezzuto* v. *John Hancock Mut. Life Ins. Co.,* 394 Mass. 399, 404 (1985), and cases cited; *Hunneman & Co.* v. *LoPresti,* 394 Mass. at 409. Compare *Bennett* v. *McCabe,* 808 F.2d 178, 180-182 (1st Cir. 1987). To recover on this theory, Bump would have to have shown at the very least that he had produced a customer ready, willing, and able to purchase LRC on acceptable terms. His efforts with Vernitron, however, yielded results far short of that accomplishment.

In the second group of cases, recovery is based upon "a purpose on the part of the [seller] to obtain without payment a profit from the [broker's] exertions . . . when the broker has performed all he has undertaken, or is plainly or evidently approaching success . . .'" *Bonin* v. *Chestnut Hill Towers Realty Corp.,* 392 Mass. 58, 70 (1984) (citations omitted); *Capezzuto* v. *John Hancock Mut. Life Ins., Co.,* 394 Mass. at 404; *Fortune* v. *Natl. Cash Register Co.,* 4 Mass. App. Ct. 386, 392 n.9 (1976), rev'd on other grounds, 373 Mass. 96 (1977). Bump's evidence does not bring his claim within the principles of these cases. Even if it could be said that he was approaching success with Vernitron, there is no evidence that the defendants were

---

[8] Bump does not contend that the principles related to brokerage agreements, generally applied to real estate sales, are inapplicable in the context of the proposed sale of a business. Rather, he relies on cases involving real estate, as do the other parties. We too think those cases are generally applicable.

attempting in any way to take advantage of Bump's efforts with Vernitron without paying him a commission.

In finding bad faith, the jury may have had in mind other questionable actions of the defendants. Bump was kept in the dark about the negotiations with MRC while Robbins, at least, knew Bump was spending time and effort trying to sell LRC. The defendants backdated documents for tax purposes. And Robbins apparently exaggerated to Bump the financial soundness of LRC. If one or more of those actions justified an award to compensate Bump for the time and money he expended unnecessarily in the futile enterprise, an issue we need not decide, no such theory was presented to the jury. The right of a broker, however, to recover a commission because of a bad faith revocation of a nonexclusive brokerage agreement is limited by the two lines of authority to which we have referred. The bad faith issue on the present record, therefore, should not have been submitted to the jury. The limited right to recover a commission in these circumstances reflects a recognition of the risks inherent in the ordinary broker-client relationship. If a deal is struck as a result of a broker's efforts, those efforts may pay off handsomely in relation to the time and effort expended. On the other hand, the reality for the broker is that all the effort expended may be for naught.

3. *Intentional interference with contract by MRC.* The jury found that Robbins had tortiously interfered with Bump's contract but assessed no damages against Robbins. The jury made the same finding against MRC and awarded Bump $93,750 in damages. We need not decide whether the verdict against MRC would have been warranted if Bump had had an exclusive brokerage agreement. Bump's evidence against MRC fell short of proof of the tort which "[i]n its classic form . . . involves the undoing of a business arrangement bound by contract . . . . The elements of the tort . . . are: '(1) intentional and wilful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice), and (4) actual damage and loss resulting.'" *Chemawa Country Golf, Inc.* v.

*Wnuk,* 9 Mass. App. Ct. 506, 509 (1980), quoting from *Walker* v. *Cronin,* 107 Mass. 555 (1871); see also Nolan, Tort Law § 71 (1979). MRC claims error in the jury's award to Bump on several grounds: 1) that Bump failed to show MRC's knowledge of the contract; 2) that Bump, not having proved the likelihood of his producing a ready, willing, and able buyer, failed to show that he was damaged; and 3) that the defendant's actions were justified. On the first point, we agree that the evidence before the jury was insufficient to give rise to an inference of knowledge on the part of MRC of the arrangement worked out between Bump and Robbins. Ibrahim El-Hefni, MRC's president, testified. Notwithstanding his recitation of frequent meetings and a close relationship between Robbins and himself, there was no evidence that El-Hefni was aware of Bump's existence, let alone that Bump was engaged in an effort to sell LRC. We also agree, on the second point that Bump did not show that his efforts with Vernitron were likely to be fruitful and that he suffered damages, therefore, as a result of the interference. The parties' negotiations had not proceeded beyond an exploratory stage. Terms had not as yet been discussed. The principals of Vernitron and LRC had never met. And reservations about the acquisition had been expressed by representatives of Vernitron. On the third point, justification, MRC is correct that some interference is permissible in the context of a nonexclusive brokerage. See *Hunneman & Co.* v. *LoPresti,* 394 Mass. at 409. There is no evidence that MRC acted with the purpose of causing damage to Bump. At most it was shown that MRC, "advancing [its] own interest, . . . [and] refrain[ing] from employing wrongful means" "pick[ed] the deal off for [it]self." *Doliner* v. *Brown,* 21 Mass. App. Ct. 692, 695 (1986). It would be a major departure from ordinary business practices and expectations if tort liability could be based on no more than a purchase of property directly from its owner while its sale is being actively promoted by a nonexclusive broker.

B. *The 93A Trial.*

At the 93A trial the judge announced that he would consider all the evidence which had been admitted at the jury trial and

that he would hear additional evidence. Only MRC offered additional evidence.

El-Hefni testified about his negotiations in 1975 and 1976 with Robbins for the sale of LRC stock to MRC. El-Hefni stated that he was aware of LRC's financial predicament, which included operating losses, poor cash flow, an inability to meet payroll, and delinquency in payment of its bank loans. However, because of the particular microelectronic product in which LRC specialized, thin film, MRC had a business-related interest in working with LRC. In 1975, an oral agreement for the sale of stock was reached, and MRC began to assist LRC with its financial problems. At some point, El-Hefni told Robbins that MRC would take care of future financial aspects of his business. Some time in early 1976, LRC operations were moved to MRC's headquarters. On MRC's tax return for 1975, LRC was listed as a subsidiary of MRC.

Robert E. Gibbons, an investment counselor, testified about the financial condition of LRC during the relevant period. He described the company as being in serious trouble, its condition deteriorating. In his opinion, LRC was insolvent on June 30, 1975. Cataloging a list of the company's ills, he concluded that on the basis of its earnings, in this period LRC had "no value at all."

1. *LRC's liability.* The judge adopted the jury's special verdicts and found that Bump had an exclusive brokerage agreement which LRC had revoked in bad faith. For the same reason that those verdicts must be set aside, insufficiency of evidence, so must the judge's findings based upon the verdicts be set aside. Nothing of significance was added at the 93A trial on the assertion of an exclusive brokerage agreement or bad faith termination. The evidence relating to those claims would not support a finding of unfairness. The judge made certain findings based on the new evidence produced at the 93A trial, however, which, taken all together, *do* support his conclusion that Robbins and LRC committed unfair and deceptive acts. He found that the information about LRC's financial soundness given to Bump by Robbins "was either false or given with reckless disregard for the truth and induced Bump to provide further

services on his behalf and on behalf of LRC." He also found that "Robbins approved the [false LRC] profile knowing Bump would, at the risk of his professional reputation, disseminate the information". And he found that Bump was never told about Robbins' dealings with MRC. Thus, Bump, unfairly, was "induced . . . to undertake a course of conduct that he would not otherwise have followed."

The judge was warranted in concluding in essence that Bump was the victim of misrepresentations and concealment of material facts which caused him to suffer losses, and that such conduct by Robbins, on behalf of LRC, constituted "unfair or deceptive acts" in a business context. G. L. c. 93A §§ 2(a) and 11.[9] See *Homsi* v. *C.H. Babb Co.*, 10 Mass. App. Ct. 474, 479 (1980); *V.S.H. Realty, Inc.* v. *Texaco, Inc.*, 757 F.2d 411, 417 (1st Cir. 1985). Compare *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 703-704 (1975); *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 626-627 (1978); *Grossman* v. *Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982). The truth about LRC's financial condition in 1975 and early 1976 was at serious odds with representations Robbins made to Bump. According to Bump's testimony, Robbins told him that the business was doing well and that its debt was under control, and Robbins suggested a proposed selling price for the company of over $1,000,000. Robbins also concealed from Bump the fact that an agreement had been reached with El-Hefni for the sale of LRC stock in 1975, well before Bump undertook his efforts to sell LRC. Bump knew nothing about this agreement until his April 22, 1976, communication with Robbins' office. Unquestionably, the deception and concealment were material. Bump would not have spent time and money in a futile effort

---

[9] Section 11, inserted by St. 1972, c. 614, § 2, provides in pertinent part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use . . . by another person who engages in any trade or commerce of . . . an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action. . . . ."

Section 2(a), inserted by St. 1967, c. 813, § 1, reads as follows: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

to sell a company that was worthless and, as a practical matter, not even available for sale. See *York* v. *Sullivan,* 369 Mass. 157, 162 (1975); *Lowell Gas Co.* v. *Attorney Gen.,* 377 Mass. 37, 51 (1979); *Homsi* v. *C.H. Babb Co.,* 10 Mass. App. Ct. at 479; *Brandt* v. *Olympic Constr., Inc.,* 16 Mass. App. Ct. 913, 914-915 (1983). One wonders why Robbins would have had Bump undertake the effort to sell LRC in the circumstances. A possible explanation is that Robbins wanted a fallback position in the event El-Hefni backed out of the agreement. In any event, whatever puzzlement we may be left with about Robbins' motivation is not a sufficient basis for setting aside the judge's clear findings and his conclusion of unfairness.

There is evidence of out-of-pocket expenditures for travel and long-distance telephone calls, time spent at meetings and in other related activities, and the usual charges Bump made for his time. The evidence of a loss of money or property, although not substantial in amount, was sufficient to satisfy G. L. c. 93A, § 11. Compare *Baldassari* v. *Pub. Fin. Trust,* 369 Mass. 33, 45 (1975); *Homsi* v. *C.H. Babb. Co.,* 10 Mass. App. Ct. at 480-481. The judge, apparently mindful of the jury's award of money damages, allowed a recovery on the 93A claim against LRC of only attorney's fees and costs. Bump should be compensated for his time and the expenses he incurred in his efforts to find a purchaser for LRC. The judge did not determine these damages; he will have to do so on remand.

The judge will also have to reconsider on remand whether the violation was "willful or knowing" and, therefore, under G. L. c. 93A, § 11, whether multiple damages should be ordered. See *Computer Syss. Engr., Inc.* v. *Qantel,* 571 F. Supp. 1365, 1373-1377 (D. Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984); *Shaw* v. *Rodman Ford Truck Center, Inc.,* 19 Mass. App. Ct. 709, 710-712 (1985). He declined to make a finding of knowledge and wilfulness in his decision, stating as his reason that "a seller who has retained a broker remains free to sell to whomever he chooses, provided no binding agreement has been signed by the broker's client. . . . Thus,

a seller can negotiate with several parties at one time without violating G. L. c. 93A." The stated rationale, however correct as a general principle, see *Capezzuto* v. *John Hancock Mut. Life Ins. Co.,* 394 Mass. at 403, has no applicability to the violation for which recovery is being allowed. The evidence warrants, if it does not compel, a finding that the deceptions which caused Bump to act to his detriment were made knowingly and willfully. Bump raised the issue of his entitlement to multiple damages in a cross-appeal, and he is entitled, therefore, to have the matter reconsidered by the trial judge.

After hearing, the trial judge determined that the plaintiffs' request for attorney's fees and costs in the amounts of $62,000 and $2,596.59, respectively, was reasonable, and he included those amounts in the judgment. That determination rested on his erroneous belief that the plaintiffs' claims, on the whole, were meritorious. Given the conclusions we reach, the amounts assessed are excessive and must be vacated. On remand, the attorney's fees and costs are to be redetermined in light of the fact that some of the findings under c. 93A are erroneous and on the basis of findings as to the value of the services rendered solely in connection with establishing the limited claim on which we authorize recovery. No amount shall be included for the appeal. See generally *Linthicum* v. *Archambault,* 379 Mass. 381, 388-389 (1979).

2. *MRC's liability.* The judge also found that MRC was liable to Bump under G. L. c. 93A. He based MRC's liability, first, on the jury's findings, which he adopted, of the exclusive brokerage agreement between Bump and LRC and of MRC's intentional interference with that relationship. If Bump were to recover on that theory, he could claim the loss of commission. What we have said on the subjects of the exclusive brokerage and the interference claim in our discussion of the related jury verdicts, however, also defeats these aspects of the c. 93A claims against MRC. Second, having found that El-Hefni knew in early 1976 of the agreement between Bump and LRC, the judge ruled that MRC acted unfairly and deceptively towards Bump to the same extent and on the same basis as LRC. Bump, thus, would be entitled to the same c. 93A damages from MRC

as he is entitled to receive from LRC. The judge's finding of El-Hefni's knowledge is based, however, on no more than his disbelief of El-Hefni's denial of such knowledge because of the close association between Robbins and El-Hefni. We agree with MRC that there is no evidence to support an inference of such knowledge on the part of MRC.

There was, however, a proper basis for imposing liability on MRC for the c. 93A violation committed by LRC. The jury, having received instructions based upon the principles enunciated in *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 618-619 (1968), found that there had been a "de facto merger" between LRC and MRC. After hearing considerable additional evidence from El-Hefni at the c. 93A bench trial concerning the relationship between the two companies from July of 1975 on, the judge also found that there had been a "de facto merger." In addition, he found that MRC was the undisclosed principal of Robbins and LRC during the period Bump was meeting with Robbins and trying to sell LRC. Although based on separate pleadings and stated as separate findings,[10] in substance, in this case at least, the "de facto merger" and undisclosed principal findings are different formulations of the same conclusion: that MRC exercised such control over LRC, and the two companies were operated so closely at the time of the conduct giving rise to the liability, that, in the circumstances, MRC was liable on agency principles for the conduct of LRC in violation of 93A.

On the evidence viewed most favorably to Bump, that conclusion was justified. MRC had become bound by contract in 1975 to purchase 80% of LRC stock. The two companies were engaged together in business activities. Consolidated tax returns, showing LRC as a subsidiary of MRC, were filed for 1975 and 1976. MRC at the time was deeply involved in the affairs of LRC and was providing LRC with extensive financial

---

[10] If they are separate theories, each supporting the imposition of vicarious liability on MRC, Bump would prevail regardless of the merits of the claim on either theory because MRC does not advance anything approaching appellate argument on the undisclosed principal theory. Mass.R.A.P. 16 (a) (4), 367 Mass. 921 (1975).

assistance. At some unknown time in 1976, LRC moved its operations to MRC's headquarters. MRC was profitable. LRC was insolvent. And Bump suffered an injury at the hands of LRC for which he ought in fairness to recover.

The case fits within the bounds of established principle.

> "Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of 'closely identified' corporations, a court 'need not consider with nicety which of them' ought to be held liable for the act of one corporation 'for which the plaintiff deserves payment.'" (Citation omitted). *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, at 619.

See also *Gopen* v. *American Supply Co.,* 10 Mass. App. Ct. 342, 344 (1980); *Pepsi-Cola Metro. Bottling Co.* v. *Checkers Inc.,* 754 F.2d 10, 15-16 (1st Cir. 1985).

One factor present in *My Bread* is absent in this case. MRC's existence being undisclosed, Bump was unaware of MRC when he was acting to his detriment, and he was not confused, therefore, about the entity with which he was dealing. We do not read *My Bread,* however, as making such confusion an absolute requirement for invoking the principle. The holding in *My*

*Bread* is based on practical reality and fairness and in the circumstances. We recognize that it is to be applied only in "rare particular situations in order to prevent gross inequity." *My Bread* at 620. Each case turns, however, on its peculiar facts, and we think the judge, who indicated that he was familiar with the *My Bread* principles and limitations, was not clearly wrong in concluding that Bump's claim presented one of those "rare particular situations" justifying recovery from a corporate entity other than the one with which he dealt.

C. *Conclusion.*

The judgment is reversed. The jury verdicts are set aside. The case is remanded to the trial judge in the Superior Court to determine damages against LRC and MRC on the c. 93A claim and whether there should be multiple damages, all on the basis of the evidence already received. The amount of the damages, multiple or otherwise, shall be added to the amount of attorney's fees and costs the judge determines to be reasonable, and judgment shall enter for Bump in that amount against LRC and MRC. Bump may have only one recovery.

*So ordered.*