DUANE F. HILLIS & another[1] vs. DONALD LAKE & another.[2]

No. 94-P-1318.

Essex. December 20, 1994. - March 6, 1995.

Present: WARNER, C.J., FINE, & GILLERMAN, JJ. *

Further appellate review granted, 420 Mass. 1105 (1995).

*Broker*, Commission. *Contract*, With broker, Sale of real estate, Performance and breach. *Hazardous Materials*.

In an action with claims for breach of contract, quantum meruit, and violation of G. L. c. 93A, brought by a real estate broker claiming a commission, the judge should have entered judgment for the defendant sellers of the property in question where there was no evidence of the sellers' bad faith dealing or other misconduct that prevented the closing or evidence of a scheme by the sellers to obtain payment from the broker's buyer without payment of a commission: the sellers had simply been unable, upon contractual contingencies, to successfully conclude a sale of their property. [227-230]

CIVIL ACTION commenced in the Superior Court Department on November 1, 1989.

The case was heard by *Elizabeth B. Donovan*, J.

The case was submitted on briefs.

*Meirwyn I. Walters* for the plaintiffs.

*Warren G. Miller* for the defendants.

GILLERMAN, J. After a jury-waived trial, a judge of the Superior Court concluded that the plaintiffs were entitled to be paid a broker's commission in the amount of $54,000, plus interest. The judge also awarded the plaintiffs their reasonable attorney's fees and costs under G. L. c. 93A because she

---

[1] John H. Brady.

[2] The defendant Donald Lake was sued individually and as trustee of both Lakeland Trust and Lakeland Park Trust. Joanna Lake appears as a defendant only as trustee of Lakeland Park Trust.

* Justice Fine participated in the deliberation on this case prior to her retirement.

concluded that the defendants had acted wilfully in violation of G. L. c. 93A, § 2, but she did not award the plaintiffs multiple damages. Both parties have appealed. We reverse the judgment for the plaintiffs.

The plaintiffs' claim to a commission is bound into the course of dealings between the defendants and their buyer. We must trace those dealings in some detail.

We draw the facts from the judge's findings and from undisputed documents that were admitted in evidence. The defendants, as trustees of the Lakeland Park Trust, were the owners of a commercial and industrial park in Peabody. Their development plan was to construct buildings, through their construction company, designed to meet the specifications of a purchaser or a tenant of the building. They engaged the plaintiff, a commercial real estate broker, to find ready, willing, and able buyers or tenants.

1. *The first agreement.* In March, 1988, the plaintiffs introduced the defendants to the principals of Patriot Properties, Inc. (Patriot). On June 14, 1988, the defendants and Patriot executed a purchase and sale agreement (the agreement) for the purchase by Patriot of land and an office building of 20,000 square feet to be constructed by the defendants to the specifications of Patriot. The building was to be known as 5 Lakeland Park Drive (the property). The purchase price was $1,810,000, payable in full at the time of the delivery of the deed.

Several clauses in the agreement are of particular importance. Paragraph six states that the defendants expect to complete construction by January 15, 1989, subject to delays caused by events beyond their control; the deed was to be delivered, and the consideration paid twenty days after notice to Patriot (or its nominee) that the building is complete and ready for occupancy. Time was not made the "essence of the agreement."

Paragraph 14 provides for a broker's commission of $54,300, payable "if and provided the Closing occurs as herein described." The plaintiffs did not sign the agreement.[3]

Paragraph 15 states that the agreement is made upon the following condition, "which shall be a condition precedent to the obligation of the SELLER to construct the building or to convey the parcel: Within sixty (60) days after the execution of this Agreement the BUYER shall deliver to the SELLER a written letter of commitment satisfactory to the SELLER from a financial institution . . . undertaking to provide to the BUYER not less than $1,810,000 of conventional mortgage financing for the purchase of the land and building described in this Agreement."

On September 30, 1988, the six individuals then associated with Patriot[4] received a letter from 1st American Bank (the bank), setting forth the bank's intention to make a mortgage loan of $1,440,000 [5] upon numerous terms and conditions, including the following:

> "¶ 22. *Evidence of Hazardous Materials.* At the option of the Lender, the Lender shall be provided with proper evidence (including, without limitation, engineering

---

[3]According to their brief, the plaintiffs agreed with the defendants to reduce their "agreed 5% commission to 3%." Based on the selling price of $1,810,000, the commission at three percent would then be $54,300, the amount found by the judge and claimed by the plaintiffs in the trial court and in this court. It appears, then, that the plaintiffs adopted the brokerage clause and are bound by the contingency of the closing. But they are bound by that contingency whether or not they adopted paragraph 14 of the agreement. See *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622, 629 (1975). The defendant argues that the plaintiff would be entitled to no more than $52,500, but that claim appears in a brief footnote, unsupported by citation to any authority, and does not constitute an appellate argument. See *Commonwealth* v. *Jacobsen*, 419 Mass. 269, 270 n.1 (1995).

[4]John McNamara, James McCathern, Mark Harrell, David Zion, Ellis Withington and Sam Black. Black was to have a thirty-seven and one-half percent interest in the transaction, McNamara's interest was to be twenty-five percent, and the remaining four individuals together owned a thirty-seven and one-half percent interest.

[5]The record does not explain the discrepancy between the $1,810,000 appearing in paragraph 15 and the mortgage commitment amount of $1,440,000.

studies conducted at Borrower's expense) from a source and in form and substance satisfactory to the Lender and Lender's Counsel indicating that the Mortgaged Premises do not contain hazardous materials as defined in the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Massachusetts General Laws, Chapter 21E." (Emphasis original.)

Under paragraph 37(a), failure to comply with any of the conditions of the letter allowed the bank to terminate its commitment.

On November 7, 1988, the defendants and Patriot executed an "Addendum" to the purchase and sales agreement. The Addendum clarified and amplified the provisions of the original agreement in various respects, and included the following provisions: the seller represented in paragraph 1(d)(iv) "that there are no toxic waste or other proscribed materials on the Premises," and any breach of that representation permitted Patriot, at its option, to terminate the agreement.[6] Paragraph 4 requires the property, at the time of the delivery of the deed, "to be then not in violation of . . . environmental laws."[7] Further on, in paragraph 6(e), the Addendum states that Patriot "acknowledges receipt from Seller of a 21E Site Assessment Report for [the] . . . Premises, dated November 4, 1984, prepared by IEP, Inc., of Northboro, Massachusetts. Any further hazardous waste inspections desired by Buyer shall be at Buyer's sole cost and expense."

---

[6] The judge found that the defendants' "superintendent of works," prior to the Patriot's transaction, notified another owner of land within the defendants' industrial park that an underground gasoline tank had been handled carelessly, and gasoline had "floated" on to the neighboring land in the park. While it does not appear that this information was given to Patriot, Patriot, as noted in the text, *infra,* performed its own environmental testing of the land under agreement and did not rely on the defendants' representation.

[7] Paragraph 6(e) of the Addendum provided that if "any one or more of the foregoing conditions are not satisfied, Buyer shall notify Seller within [30] days of the execution hereof in which event all deposits made hereunder shall be refunded forthwith to the Buyer, and this Agreement shall be deemed null and void both at law and in equity without further recourse to the parties hereto."

(The 1984 report of IEP, Inc., disclosed that the property was free of pollutants.) The provision in the original agreement regarding the brokers' commission was not altered.

Patriot then engaged IEP, Inc., to conduct further testing at the site, and they reported the presence of oil in violation of G. L. c. 21E. On February 6, 1989, a copy of the report of IEP was sent to the defendants. The February 6th letter also states that the responsibility was on the defendants to determine the full extent of the release of hazardous materials, and to arrange for the prompt clean-up at the expense of the defendants. However, Patriot confirmed its intention to purchase the property once the premises were put in compliance with the environmental laws. Nevertheless, as a result of these events, the bank withdrew its commitment, and Black and McNamara (see note 4 *supra*) withdrew from the deal.

2. *The second agreement.* On March 8, 1989, the defendants sent Patriot's counsel a copy of a new site investigation report of IEP dated March, 1989. That report concluded that no work was required on the site, and that if any work was required it could occur off-site. On that basis, the defendants wrote, "we see no reason to postpone the closing any longer." The parties resumed their efforts to close on the transaction.[8]

On June 2, 1989, the defendants wrote the plaintiffs that they had decided to terminate the brokerage arrangement, but the letter added, "It is not my intention to cut you out of any commissions that may be due to you, and in that vein we will pay a 5% total commission on Crystal Systems if that building goes forward. We have already discussed Patriot Properties and that commission will be paid as soon as possible."[9]

---

[8]Meanwhile, the defendants had completed the building, a certificate of occupancy issued in December, 1988, and Patriot moved into the building, but paid no rent by agreement with the defendants.

[9]There was conflicting testimony regarding the content of the discussion of the "Patriot Properties" referred to in the letter of June 2d. The conflict was left unresolved by the judge with the result that the statement that the "commission will be paid as soon as possible" has no clear meaning. In particular, it is unclear whether, or the extent to which, the restructured

On June 12, 1989, the entire transaction was restructured and a new series of documents and agreements were signed. Patriot brought in a new investor, Ro-Jo Realty Trust (which acquired a twenty-five percent interest), and the defendant Donald Lake took a thirty-seven and one-half percent interest, replacing McNamara and Black, respectively. A joint venture was formed, known as Five Lakeland Park Partners, the beneficial interests in which were held by Patriot Properties Trust, thirty-seven and one-half percent; Ro-Jo Realty Trust, twenty-five percent and the defendant Donald Lake, thirty-seven and one-half percent. The joint venture became the sole beneficiary of a newly organized trust known as Five Lakeland Park Trust. The new joint venture was capitalized with $500,000, of which the defendant Donald Lake was obliged to contribute $187,500. Thus, defendant Lake, who was to receive $1,810,000 in cash under the first agreement, was now obliged under the second agreement to contribute $187,500 in cash. There was no provision for a broker's commission in the second agreement.

The property was then conveyed by Lakeland Park Trust to Five Lakeland Park Trust in exchange for a $1,410,000 mortgage note (guaranteed by the individual investors, including Donald Lake, in proportion to their respective contributions) due June 12, 1991, and $400,000 in cash provided by the joint venture.[10]

Finally, a written agreement dated June 12, 1989, between the defendants as trustees of the Lakeland Park Trust and the trustees of the Five Lakeland Park Trust, recited the existence at the premises of "low concentrations" of contaminating materials and the defendants' agreement "to pursue the remedial work expeditiously and diligently until it is completed." If the defendants were not able to obtain, on or before June 12, 1991 (the due date of the note), a satisfac-

deal of June 12th was fully formed on June 2d, and, if so, what impact the new structure was to have on the plaintiffs' right to a commission. There are no findings on these factual issues.

[10]The defendants used the cash payment to discharge the construction mortgage on the premises.

tory report of a qualified engineer that no contamination of the premises was present, the buyer had the option to require the defendants to repurchase the premises for $1,810,000, payable as $400,000, plus principal payments on the mortgage note, in cash, and the balance by the return of the $1,410,000 mortgage note. In December, 1990, the defendants, in a balance sheet given a bank, recorded an account payable due the plaintiffs in the amount of $54,000. [11]

The defendants did not tell the plaintiffs of the restructured transaction nor of the sale on June 12, 1989. The plaintiffs learned of the sale by searching the records at a registry of deeds.

The judge found that Lakeland Park Trust "was unable" to obtain the required environmental certification, and, as required by the agreement of June 12, 1989, the defendants repurchased the property on October 3, 1991, and discharged the mortgage.

3. *Discussion.* On these facts the judge concluded that the first agreement "did not close in accordance with the parties' contract only because of the seller's inability to back up its promise that the land was free of toxic materials such as gasoline." The judge relied on *Lewis* v. *Emerson*, 391 Mass. 517, 524-525 (1984), but there the seller, after extracting an additional ten thousand dollars from the buyer after the purchase and sale agreement was signed, did not appear at the closing, and was in default of his obligations under the agreement. The seller's default, the trial judge found, was both wilful and without justification, and the broker was entitled to his commission. The Supreme Judicial Court concluded, without discussion, that there was no error, measured by *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622, 629 (1975) (broker is entitled to a commission where title does not pass if the closing is prevented by "the wrongful act or interference of the seller").

Massachusetts law is now settled that the kind of conduct by the seller which fastens liability upon him in the absence

---

[11]As of December, 1990, the new buyer had not yet demanded the rescission of the transaction.

of a closing is "bad faith dealing, or some other misconduct" which prevents the closing, or a scheme by the seller to obtain payment for his property from the broker's buyer without payment of a commission. *Capezzuto* v. *John Hancock Mut. Life Ins. Co.,* 394 Mass. 399, 404 (1985). See also *Hunneman & Co.* v. *LoPresti,* 394 Mass. 406, 409 (1985); *Bump* v. *Robbins,* 24 Mass. App. Ct. 296, 307 (1987) (seller's bad faith may arise out of a wrongful default in its contractual obligations or a scheme to avoid payment of a commission while profiting from the sale); *Dalvis, Inc.* v. *Coz,* 32 Mass. App. Ct. 736, 741 (1992). [12]

The defendants in this case cannot be charged either with preventing the closing by a bad faith default, as in *Lewis* v. *Emerson, supra,* or obtaining payment for their property while avoiding payment of the plaintiffs' commission, for the outcome was that they were unable to dispose of their property.

The performance of the original purchase and sale agreement was expressly made contingent upon Patriot obtaining a satisfactory mortgage commitment letter, and it was the bank that imposed the requirement on Patriot that the premises not contain hazardous materials in violation of Massachusetts law. The parties then executed the Addendum in which the defendants represented that there were no hazardous materials on the premises, meanwhile delivering to Patriot the 1984 IEP "clean" report. Whatever may have been the purpose of that representation, it is clear from the contract provisions that further testing was to be done by Patriot and at its own expense. In fact, Patriot did conduct further tests at its own expense. Those tests revealed the existence of hazardous materials at the premises, the bank withdrew its commitment, and two of the investors withdrew from Patriot.

We perceive no bad faith or wrongful default in this sequence of events for the defendants were under no contrac-

---

[12]The plaintiffs rely upon *Bennett* v. *McCabe,* 808 F. 2d 178 (1st Cir. 1987). We have previously expressed our doubts whether *Bennett* accurately reflects Massachusetts law. See *Dalvis, Inc.* v. *Coz, supra* at 740 n.5.

tual obligation to remove all hazardous materials from the premises. The Addendum provided that the failure of the defendants' representation was an occasion only for Patriot's right to terminate the agreement, not for a claim to damages for a wilful default in the obligations of the defendants. Any failure of the defendants' representation was to be regarded as the same as the failure of Patriot, for example, to obtain a mortgage commitment letter: each event was an occasion to terminate the transaction without fault by or liability to either party. There is no doubt that the parties so understood the Addendum, for in March, 1989, IEP — now engaged again by the defendants — produced another favorable report, and that was enough to inspire the parties to work together toward a second agreement.

At all events, the parties, as contemplated by the second agreement, abandoned the first transaction because the bank had withdrawn its commitment letter, not because the defendants had wilfully defaulted in the performance of their contractual obligations, as the judge concluded. The abandonment of the first agreement by both parties also precludes any claim that the defendants wrongfully retained the profits of the transaction while refusing to pay the brokers a commission.

Nevertheless, the plaintiffs may be entitled to a commission if the second agreement was merely different from the first agreement in form, not substance, and if there was a closing on that agreement, or a wilful default by the defendants. See *Bonin* v. *Chestnut Hill Towers Realty Corp.*, 392 Mass. 58, 66 (1984). Here, the plaintiffs are confronted with several difficulties. First, the second agreement was substantially different from the first agreement. Under the second agreement the defendants received $400,000 in cash, not $1,810,000, and in the second agreement, the seller Donald Lake was obliged to *purchase* a thirty-seven and one-half percent interest in the buyer for $187,500.[13]

---

[13]As stated earlier, an additional twenty-five percent, or $125,000, was provided by Ro-Jo Realty Trust which was produced by Patriot, not the plaintiffs. The result was that the plaintiffs' customer, Patriot, provided

Second, while title passed under the second agreement, that conveyance was expressly made subject to the right of the buyer to rescind the transaction within two years if the defendants had not by then performed their new obligation to clean up the premises. Again, there was no bad faith or misconduct by the defendants. So far as appears from the judge's findings or elsewhere in the record — and the plaintiffs' brief makes no argument to the contrary — the failure of the defendants to obtain the required environmental certification within the two-year period was not the result of any wilful default or mischievous scheme on their part.[14]

The result of both agreements was that the defendants, without fault on their part, never disposed of their property without recourse, and it is not unjust for the plaintiffs' claim to fail. See *Plymouth Port, Inc.* v. *Smith,* 26 Mass. App. Ct. 572, 574-575 (1988).

The judgment is reversed and a new judgment entered in favor of the defendants on all counts [15] in the plaintiffs' complaint.

*So ordered.*

---

funds for only thirty-seven and one-half percent of the second transaction. In the circumstances described, the plaintiffs could not be found to be the efficient cause of the second transaction. See *Bonin* v. *Chestnut Hill Towers Realty Corp.,* 392 Mass. 58, 66-67 (1984).

[14]The judge merely found that "Lakeland Park Trust was unable to obtain the certification necessary to indicate that the property had been cleaned within the period set forth in the [second] agreement."

[15]The complaint consists of three counts: breach of contract; quantum meruit; and violation of c. 93A.