DUANE F. HILLIS & another[1] vs. DONALD LAKE[2]
& another.[3]

Essex. November 9, 1995. - December 15, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Broker*, Commission. *Contract*, With broker, Sale of real estate, Performance and breach. *Hazardous Materials.*

In an action to recover a broker's commission in connection with an agreement to sell property, there was no basis for an award of the commission sought where the purchaser had not completed the transaction by closing the title in accordance with the provisions of the contract and where no wrongful conduct of the seller had caused the failure of the completion of the contract [541-543], nor was there a basis for the award of a commission with respect to a superseding transaction that was different in form and substance from the original contract [543-544].

This court stated that *Bennett* v. *McCabe*, 808 F.2d 178 (1st Cir. 1987), is not a correct statement of Massachusetts law on the issue of a broker's entitlement to a commission where a seller's default on a purchase and sale agreement does not amount to wrongful acts or interference. [545-546]

CIVIL ACTION commenced in the Superior Court Department on November 1, 1989.

The case was heard by *Elizabeth B. Donovan*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Meirwyn I. Walters* for the plaintiffs.

*Warren G. Miller* for the defendants.

----

[1]John H. Brady.

[2]Individually and as trustee of both Lakeland Park Trust and Five Lakeland Park Trust.

[3]Joanna Lake, as trustee of Lakeland Park Trust.

*Robert S. Kutner*, for Massachusetts Association of Realtors, amicus curiae, submitted a brief.

GREANEY, J. The plaintiffs, partners in a real estate brokerage firm, brought this action in the Superior Court to recover a commission on a sale of real estate. The complaint asserted claims of breach of contract, quantum meruit, and a violation of G. L. c. 93A, § 11 (1994 ed.). The case was tried before a judge sitting without a jury. The judge concluded that the plaintiffs were entitled to a commission with interest and, on her finding of a violation of G. L. c. 93A, an award of attorney's fees. The Appeals Court reversed the judgment, 38 Mass. App. Ct. 221 (1995), concluding that the plaintiffs were not entitled to a commission and that judgment should enter for the defendants on all claims. We granted the plaintiffs' application for further appellate review. We also conclude, in substantial agreement with the reasoning of the Appeals Court, that the plaintiffs were not entitled to a commission. Accordingly, we reverse the judgment, and order entry of judgment for all the defendants. We also take the opportunity to state that *Bennett* v. *McCabe*, 808 F.2d 178 (1st Cir. 1987), on which the plaintiffs rely, and which supports their position, is not a correct statement of Massachusetts law on the point with which we are concerned.

The judge's findings, supplemented by references to the transcript, disclose the following facts. Donald Lake, and his wife, Joanna, in their capacity as trustees of Lakeland Park Trust (defendants), were the owners of a parcel of real estate in Peabody which they had purchased in 1984, with the intent of developing the land as an industrial park. Before purchasing the property, Lake had it examined for the presence of hazardous materials as defined by G. L. c. 21E. Hazardous materials were not found. Lake also owned a construction company, and his intention in developing the park was to build to suit for prospective tenants. John Brady, a partner in a commercial real estate firm, met Lake in 1986, while Brady was seeking a suitable site for a building for his client, Federal Express. An agreement was concluded be-

tween Lake and Federal Express, which became one of the first tenants of the industrial park.

After this successful collaboration, at Lake's request, Brady became the exclusive broker for the industrial park. The agreement between Lake and Brady was oral. It was understood that Lake was only interested in tenants for whom he would construct a building, and who, after construction was completed, might lease or purchase outright the resulting structure. Brady's commissions were to be five per cent of the gross sale price.

*First agreement.* Around April, 1988, Brady received an inquiry from the vice-president of Patriot Properties, Inc. (Patriot), who indicated that the company wanted to construct an office building. Brady showed the property in Peabody to principals of the company, and he arranged a meeting between Lake and Patriot's principals. On June 14, 1988, a purchase and sale agreement was executed between Patriot and the defendants for the purchase of land and a building constructed to Patriot's specifications. The purchase price was set at $1,810,000. The agreement provided for a broker's commission of $54,300, payable "if and provided the Closing occurs as herein described."[4] With a $400,000 construction mortgage from the Bank of New England in hand, Lake's construction company commenced construction of the building. At all times, Patriot's principals intended to seek additional investors in the project. It was anticipated that Patriot's principals would own a thirty-seven and one-half per cent interest in the project and two other investors would own the remainder.

The purchase and sale agreement obligated Patriot to provide a mortgage commitment letter to the defendants. By a letter dated September 28, 1988, First American Bank issued a financing commitment in the amount of $1,410,000. A condition of the commitment was a requirement that, at the op-

---

[4] Brady had agreed to reduce his commission to three per cent of the purchase price. The plaintiffs did not sign the purchase and sale agreement.

tion of the bank, it would be provided with evidence that the property did not contain any hazardous materials. In response to this requirement, the defendants and Patriot executed an addendum to the purchase and sale agreement, in which the defendants warranted that the property was free of hazardous materials.[5] The bank, nonetheless, insisted on an inspection, which disclosed the presence of contamination in the ground water.[6] The bank withdrew its financing commitment, and the investors other than Patriot also withdrew from participation in the project. Patriot, however, which had been occupying the already completed building rent free for several months, remained interested in completing the purchase.

*Second agreement.* By June, 1989, Patriot had located another investor, Ro-Jo Realty Trust, whose principals agreed to acquire a twenty-five per cent interest in the project. As had been the case under the first agreement, Patriot's principals would acquire a thirty-seven and one-half per cent interest in the project. To conclude the transaction, Lake himself agreed to acquire the remaining thirty-seven and one-half per cent interest in the project. A joint venture was formed, known as the Five Lakeland Park Partners, which became the sole beneficiary of a newly organized trust, the Five Lakeland Park Trust.

Each of the three partners contributed a share in the initial capitalization ($500,000) of the project in proportion to his, or its, interest in the project. On June 13, 1989, the building and land were sold by the defendants to Five Lakeland Park Trust for $1,810,000. The parties did not obtain financing for the deal from a third party. Lake himself fi-

---

[5] In signing the addendum, Patriot acknowledged receipt of a copy of the report on the G. L. c. 21E inspection that had been conducted in 1984, in conjunction with the defendants' purchase of the property. Patriot also agreed to assume the cost of further inspections for hazardous materials.

[6] It was subsequently determined that gasoline had leaked from an underground tank installed by Federal Express in connection with its business operation in the industrial park. The judge made no finding that the defendants knew about the leak or about contamination from any other source, and no such finding would have been warranted.

nanced the transaction. The buyer paid $400,000 in cash, and executed a mortgage note to the defendant in the amount of $1,410,000, secured by a purchase money mortgage on the property. An agreement concluded simultaneously with the sale provided that "[i]f, on or before [June 12, 1991] the Seller delivers to the Buyer a report of a qualified environmental scientist or engineer . . . stating that there is no evidence of hazardous waste or oil . . . present on the Property . . . the Buyer shall exercise its best efforts to pay the unpaid principal balance and accrued interest due on the [mortgage note] as soon as is reasonably practical . . . . If the Seller has not delivered the Report . . . to the Buyer on or before [June 12, 1991], the Buyer, at its option, may elect to require the Seller to repurchase the Property from the Buyer for the sum of [$1,810,000]."

The defendants used the $400,000 in cash received at the time of the sale to pay off the construction mortgage held by the Bank of New England. From June 13, 1989, through approximately October 3, 1991, monthly payments were made by Five Lakeland Park Trust on the mortgage notes. Lake contributed his pro rata share to these payments. At the end of two years, the defendants were not able to produce certification that the contamination on the property had been cleaned up. In keeping with the June 13, 1989, agreement, the defendants repurchased the property and discharged the mortgage. The $400,000 cash contribution was refunded to the investors in proportion to their shares in the project. The plaintiffs received no commission on the June 13, 1989, sale of the property.

1. Based on these facts, the judge concluded that the sale contemplated in the first agreement "did not close in accordance with the parties' contract only because of the seller's inability to back up its promise that the land was free of toxic materials such as gasoline." This lapse on the defendants' part was sufficient, in the judge's view, to require payment of a broker's commission to the plaintiffs. We do not agree that the conditions for payment of a broker's commission were met.

"When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract." *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622, 629 (1975), quoting *Ellsworth Dobbs, Inc.* v. *Johnson*, 50 N.J. 528, 551 (1967). The third requirement was not met here because no closing occurred under the first agreement.

The requirement that the sale actually be consummated, however, is subject to an exception. We have said that a broker has an enforceable claim when the first two requirements are met but "the failure of completion of the contract results from the wrongful act or interference of the seller." *Id.* Both our decisions, and those of the Appeals Court, have consistently insisted on wrongful conduct on the part of the seller which undermines completion of the sale as a prerequisite to a broker's recovery. See *Lewis* v. *Emerson*, 391 Mass. 517, 524 (1984) (commission due if closing is prevented "by the wrongful conduct of the seller"); *Dalvis, Inc.* v. *Coz*, 32 Mass. App. Ct. 736, 741 (1992) (no entitlement to commission in absence of "bad faith or wrongful act or interference with the contract by the [seller]"); *Lobosco* v. *Donovan*, 30 Mass. App. Ct. 53, 56 (1991) (seller obligated to pay commission if sale fails through seller's "wrongful act or interference"); *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 307 (1987) (seller must pay broker's commission "where a seller wrongfully defaults"); *Currier* v. *Kosinski* 24 Mass. App. Ct. 106, 107-108 (1987) (seller liable for commission if "consummation [of sale] is wrongfully thwarted by the seller"). See also *Capezzuto* v. *John Hancock Mut. Life Ins. Co.*, 394 Mass. 399, 403-404 (1985) (when seller has not agreed to sell to broker's customer, no liability for commission unless seller acts in bad faith or engages in other misconduct).

The exception does not apply to this case. The defendants had not agreed to remove hazardous materials from the

property. As the Appeals Court observed: "The Addendum provided that the failure of the defendants' representation was an occasion only for Patriot's right to terminate the agreement, not for a claim to damages for a wilful default in the obligations of the defendants. Any failure of the defendants' representation was to be regarded as the same as the failure of Patriot, for example, to obtain a mortgage commitment letter: each event was an occasion to terminate the transaction without fault by or liability to either party." 38 Mass. App. Ct. at 229. We agree with this analysis. The judge did not find, and no such finding would have been warranted on the evidence, that the failure of the sale was the product of any bad faith or wrongful interference by the defendants. We conclude that the failure of the first agreement was not caused by any wrongful conduct on the defendants' part.

2. As the Appeals Court correctly recognized, the plaintiffs would still be entitled to a commission "if the second agreement was merely different from the first agreement in form, not substance, and if there was a closing on that agreement, or a wilful default by the defendants." 38 Mass. App. Ct. at 229. See *Bonin* v. *Chestnut Hill Towers Realty Corp.*, 392 Mass. 58, 66 (1984) (commission due when transaction, "while different in form, conformed in substance to the terms of the agreement"); *Morad* v. *Haddad*, 329 Mass. 730, 734-735 (1953) (same). Here, the second agreement differed substantially from the first agreement, and the difference rendered the second agreement substantially less favorable to the defendants than the first agreement had been.

Under the first agreement, the defendants would have been guaranteed a return of $1,810,000 minus the cost of their investment in the project. That investment would have consisted only of some portion of the original purchase price of the property, and the approximately $400,000 cost of constructing the building to Patriot's specifications. Any risk of default by the purchaser would have rested with the bank which loaned the funds to Patriot and its fellow investors to make the purchase. In contrast, the second agreement re-

quired that the defendants assume virtually all of the financial risk associated with the project. The financial risk to the defendants under the second agreement was twofold. Because the defendants were the holders of the mortgage on the property, the risk of default by the purchaser fell wholly on the defendants. In addition, the sale under the second agreement was contingent: if the defendants were unable to provide assurance, within two years, that contamination on the property had been eliminated, the sale would be rescinded. That these financial risks to the defendants were significant is proved by the fact that the sale was rescinded in 1991. Moreover, under the second agreement, instead of an outright conveyance of the entire property, Lake was required to retain a thirty-seven and one-half per cent interest in the project, which might or might not have proved profitable, but which created additional financial risks and apparently was not an investment envisioned during the discussions between Brady and Lake.[7] Clearly, the second agreement, which would appear attributable to some desperation on the defendants' part, differed in substance from the first agreement. Thus, we agree with the Appeals Court that the plaintiffs were not entitled to a commission on the basis of the sale under the second agreement.[8]

---

[7]Under the agreement between Brady and Lake, the defendants would have been required to pay a commission in the absence of an outright sale if a tenant was found who was willing (like Federal Express) to enter into a long-term lease on a building constructed to the prospective lessor's specifications. The second agreement was not analogous to a long-term lease.

[8]The plaintiffs place weight on a June 2, 1989, letter written by Lake to Brady that terminated the parties' brokerage agreement. In the letter, Lake also indicated that he intended to pay any commissions due to the plaintiffs and noted: "We have already discussed Patriot Properties and that commission will be paid as soon as possible." There was conflicting testimony on the content of the discussion between Lake and Brady to which the letter referred. As the Appeals Court noted, "[i]n particular, it is unclear whether, or the extent to which, the restructured deal of June 12th was fully formed on June 2d, and, if so, what impact the new structure was to have on the plaintiffs' right to a commission." Hillis v. Lake, 38 Mass. App. Ct. 221, 225-226 n.9 (1995). In view of our conclusion that, as matter of law, the plaintiffs were not entitled to a commission in

3. We comment briefly on *Bennett* v. *McCabe*, 808 F.2d 178 (1st Cir. 1987). In that case, the parties executed a purchase and sale agreement for the purchase of a motel. The real estate broker received a ten per cent deposit from the buyer which was held in escrow pending the closing. Prior to the closing, the parties discovered a defect in title which no one knew of previously. When the seller was unable to correct the defect in a timely manner, the seller asked the broker to return the deposit to the prospective purchaser. The broker declined and brought an action in the United States District Court for the District of Massachusetts seeking to recover a broker's commission. The District Court granted summary judgment for the defendants on the basis of *Tristram's Landing, Inc.* v. *Wait, supra.* The United States Court of Appeals for the First Circuit reversed. The Court of Appeals detected a "gray area" in the *Tristram's Landing* decision concerning a default by a seller that did not amount to wrongful acts or interference. *Bennett, supra* at 181. The Court of Appeals held that the seller would be liable for a broker's commission even if the seller's default was innocent, concluding that this court would adopt this conclusion if it were faced with facts like those in the *Bennett* case. *Id.* at 182. In so doing, the Court of Appeals assumed that this court would prefer a "bright line rule" which would award a broker the commission when the seller defaults on a binding purchase and sale agreement whether the default is innocent or motivated by bad faith. *Id.* at 183-184.

The *Bennett* decision does not state Massachusetts law correctly. Our law is as set forth in the cases described above. In circumstances like those present in this case and in the *Bennett* case, the broker is not entitled to a commission unless it appears that the closing is prevented by wrongful conduct on the seller's part. We continue to believe that "[o]rdinarily when an owner of property lists it with a broker for sale, his expectation is that the money for the payment of commission

the circumstances present here, we give no significance to Lake's ambiguous promise to pay.

will come out of the proceeds of the sale." *Tristram's Landing, Inc.* v. *Wait, supra* at 628, quoting *Ellsworth Dobbs, Inc.* v. *Johnson, supra* at 547. As we have previously stated: "We acknowledge that brokers also have legitimate expectations, and that, 'if the broker brings the parties together on mutually acceptable terms he expects a commission for his labor.' *Stanchak* v. *Cliffside Park Lodge No. 1527 Loyal Order of Moose, Inc.*, 116 N.J. Super. 471, 479 (1971). Nonetheless, we conclude that the broker is in a better position than the seller to protect these expectations by including, in the brokerage contract, a provision that the broker is entitled to its commission when it produces a ready, willing, and able buyer whom the seller, for whatever reason, refuses to accept. In the absence of such a provision the burden is rightfully placed on the broker, in light of the fact that 'many sellers, unlike brokers, are involved in real estate transactions infrequently . . . and are thus unfamiliar with their legal rights.' *Tristram's Landing, supra* at 630." (Footnotes omitted.) *Capezutto* v. *John Hancock Mut. Life Ins. Co.*, 394 Mass. 399, 403-404 (1985).

4. The judgment is reversed, and a new judgment is to enter in favor of all defendants on the counts in the plaintiffs' complaint.

*So ordered.*