Agnes, A.J.
BACKGROUND
The plaintiff is a real estate brokerage firm and the defendant Howard Hood is the owner of approximately 8 acres of land in Ipswich, Massachusetts located at 317 and 319 Linebrook Road. The defendant, Kenneth Hood, *71 is the son of defendant Howard Hood, the trustee of a trust that holds the legal title to the real estate in question and holder of a durable power of attorney from Howard Hood. Complaint, exhibits A & B. Based on the hearing conducted by the court, there does not appear to be any dispute about some of the basic facts.
The parties entered into an exclusive listing agreement on or about September 16, 1999 whereby the plaintiff agreed to use reasonable efforts to procure a buyer for an “8.8± acres of land with 2 single-family wood frame homes . . . for 8112,250 per approved lot ($890,000 for 8 proposed lots) or such other price, terms and conditions accepted by the seller for the period from Thursday, November 18, 1999 through Friday, March 31, 2000.” Complaint, exhibit B. The seller, in turn, agreed to pay a fee for services (of 4.5% or 5.5% of the sale price depending on which broker actually sold the properly) “if a prospective purchaser is procured ready, willing, and able to buy in accordance with the price and terms of this agreement or such other price and terms acceptable to the seller.” Complaint, exhibit B. The agreement also contained a clause stating that “(b)uyer to employ and pay Meridian Engineering to obtain subdivision approval.” Complaint, exhibit B.
A prospective buyer, Mr. Thomas Groom, president of Groom Development Corporation, was procured by the plaintiff. Following negotiations among the parties, on December 17, 1999, Meridian Engineering provided the buyer with a proposal for engineering services relative to the above project. In particular, Meridian set forth in detail a plan for the preparation of a subdivision plan and the supporting documents necessary to obtain approval from the Town of Ipswich. Complaint, exhibit D. In particular, the plan included the cost of “on-site soil evaluation and percolation testing” and preparation of a “soil report” that was suitable for submission to the Town of Ipswich. Cost of the services was stated tobe $24,200. Thereafter, on or about January 27, 2000, Mr. Groom and the defendants signed a purchase and sales agreement. Complaint, exhibit E (hereafter, “P&S Agreement”). The agreement describes the property as the 8.8-acre parcel referred to in the listing agreement and provides further that the brokerage fee is to be paid only when seller receives the full purchase price and buyer accepts and records seller’s deed. Complaint, exhibit E. It calls for a closing no later than August 15, 2000.
The P&S Agreement contains a “rider” in which the parties agree that it is subject to the approval by the Ipswich Planning Board of a residential subdivision proposal prepared by Meridian Engineering Inc. The P&S Agreement sets out a schedule of purchase prices depending on whether there is an 8, 7 or 6 lot subdivision and provides that “[i]f the Town of Ipswich approves less than six lots then buyer will have the right to terminate the agreement, without legal or equitable recourse to either party and all deposits shall be returned to buyer.” Also, the rider states that ”[a]U costs of obtaining such approvals for this project shall be borne by the buyer. Seller shall provide final percolation tests for the eight residential lots each having a four-bedroom home.” Complaint, exhibit E. It also makes the buyer responsible for obtaining “preliminary” percolation tests “as soon as practical” and to make a “best effort” to obtain approval of the 8-lot subdivision.
It appears that during the first several months of this year, buyer paid money to Meridian Engineering and the preparation work for the subdivision plan went ahead. It also appears that buyer obtained a commitment for financing a subdivision with at least six approved lots. Sometime in March 2000, an application to schedule percolation tests on the property in question was submitted to the Town of Ipswich by Mr. Tom Groom of Groom Construction Corporation. The application notes that Howard Hood is the owner and indicates that the testing is to be conducted by Meridian Engineering, Inc. See Affidavit of Attorney Arthur K. Ross, Jr., exhibit B (and second affidavit of Mr. Ross as well). However, it turns out that the Town of Ipswich requires that applications for percolation testing must be filed by February 16th of each year. An effort was made by the buyer and Meridian Engineering, Inc. to secure a waiver of this deadline. Affidavit of Mr. Ross, exhibit C. However, on April 11, 2000, the Town rejected the request for a waiver. Affidavit of Mr. Ross, exhibit D; Affidavit of Richard Kallman, paragraph 5.
The defendants have offered evidence that the broker informed them that the buyer had arranged with Meridian Engineering, Inc. for the final percolation tests and that the seller would pay for them. Affidavit of Kenneth Hood, page 2.[1] The plaintiff relies on the express language of the P&S Agreement that assigns to the seller responsibility to obtain the “final percolation tests” and adds that “[t]his provision was a critical element of the Agreement as Groom was purchasing the land for development of house lots for sale to the general public.” Affidavit of Attorney Kallman, paragraph 3. Also, the plaintiff relies on an affidavit by the buyer that he never undertook to assume responsibility for nor told anyone that he would obtain the final percolation tests, that he did not file the application with the Town of Ipswich, and that only the seller could apply for percolation tests. Affidavit of Thomas Groom.
It appears that there were further negotiations or discussions between the prospective buyer and the defendants. See Affidavit of Attorney Kallman, paragraphs 6-17. However, at some point, the deal broke down. There is evidence that the buyer was unable to secure the necessary financing without satisfactory percolation tests for however many lots might be approved for subdivision. See Affidavit of Attorney Kallman at paragraph 11.
At the hearing in this matter there was considerable attention given to the late filed application for percolation testing. Both parties now appear to agree that an application was indeed filed in March 2000. According to the plaintiff, the Health Director of the Town of Ipswich has *72 advised that it contains no signature and that “the owner of the property is the only person who is authorized to apply for a percolation test from the Board of Health.” Affidavit of Attorney Thomas Sullivan at 1.
DISCUSSION
The present litigation does not encompass the dispute between the buyer and the seller that may still exist. Instead, the broker-plaintiff takes the position that the buyer had the responsibility under the P&S Agreement to “provide final percolation tests” for the lots in question, and, therefore, the buyer is responsible for the late filing of the application' with the town. Thus, the plaintiff argues, the deal fell through as a result of the wrongful conduct of the buyer, and it is entitled to its real estate commission. Thus, the plaintiff reasons that it comes within the exception to the rule that a real estate transaction must be consummated before a broker is entitled to recover the commission expected upon completion of the sale. This exception was stated in Tristram’s Landing, Inc. v. Wait, 367 Mass. 622, 629 (1975), and elaborated on in Hillis v. Lake, 421 Mass. 537 (1995). In these cases the Supreme Judicial Court held that a broker earns a commission even though the transaction is not consummated so long as (1) the broker produces a purchaser ready, willing and able to buy, (2) the purchaser and seller enter into a binding contract, and (3) there is “wrongful conduct on the part of the seller which undermines completion of the sale.” Tristram’s Landing, supra, 367 Mass, at 629; Hillis, supra, 421 Mass, at 542.
Although the various affidavits discussed above indicate that there are facts in dispute with respect to whether the buyer or the seller took responsibility for procuring the final percolation tests, I will assume for purposes of the plaintiffs motion that at all times it was the buyer’s duty to file the application for final percolation tests in a timely manner and that he failed to comply with his obligation in that regard. The question is whether that constitutes “wrongful conduct” within the meaning of the rule in Tristram’s Landing and Hillis. In Hillis, a purchase and sale agreement for commercial properly was amended to include an addendum that the seller warranted it was free of hazardous material because the buyer otherwise would not be able to secure financing. Ultimately, the deal fell through because the financing did not materialize, and the broker brought suit to recover its commission claiming that the seller had engaged in wrongful conduct. In rejecting this claim, the Supreme Judicial Court drew a distinction between a case in which the agreement is not consummated due to the failure of party to comply with a representation such as the one involving hazardous materials or one involving the obtaining of financing, on the one hand, and a case in which the agreement for the sale of property fails due to the seller’s “bad faith or wrongful interference.” Id. at 543. The implication of this language is that a seller must act or fail to act in bad faith or with the intention of preventing the deal from being consummated in order for the broker to be entitled to recover its commission. This view is strengthened by the fact that in Hillis, the Supreme Judicial Court took the occasion to distinguish Bennet v. McCabe, 808 F.2d 178 (1st Cir.1987), in which the Court of Appeals stated that a seller would be liable to the broker even in circumstances in which its default was innocent. In this regard, I adopt and follow the reasoning in Sebell v. Andover Bldg. & Development Corp., 9 Mass L. Rptr. 283, 1998 WL 1181683 (Mass. Superior Court) (12/3/98) (VanGestel, J.).
In the present case, it appears that there was less than a 3-week window from the signing of the purchase and sale agreement (January 27, 2000) to the deadline for filing an application for percolation testing (February 14, 2000). There is no indication that either party was aware of the deadline. There is no reference to a deadline in the contract between the buyer, Groom Construction Company, and Meridian Engineering, Inc. that is dated December 17, 1999. In fact, one could interpret that contract as encompassing the preparation of the percolation tests that were to be submitted to the Town of Ipswich. See Complaint, exhibit D. In any case, it was made clear from the outset of the dealings between the parties, including the broker, that the buyer and Meridian Engineering, Inc. had some responsibility for obtaining subdivision approval. See Complaint, exhibit B (Listing Agreement) (“Buyer to employ and pay Meridian Engineering to obtain subdivision approval”). There is nothing which suggests any conduct or inaction taken by the sellers that was calculated to frustrate the consummation of the purchase and sale agreement. In particular, there is no evidence that the sellers impeded the buyer or Meridian Engineering in preparing or filing the application for percolation tests with the town. Viewed in the light most favorable to the plaintiff, on the record before me the best that may be said is that this is a case in which the seller was negligent and, as a result, both he and the buyer lost the benefit of their bargain. Under the exception announced in Tristram’s Landing and explained in Hollis and Sebell cases, the broker is not entitled to recover the value of its commission when the deal falls through as a result of the seller’s negligent, though not bad faith, conduct in failing to carry out an obligation under the purchase and sale agreement.
ORDER
For the above reasons, the motion for an attachment is DENIED.

 Defendants maintain that there was another roadblock to the consummation of the deal because the Town of Ipswich has a by-law or regulation that dead end streets cannot be longer than 600 feet and without a waiver of this rule, only five lots could be constructed in the proposed subdivision. See Affidavit of Kenneth Hood at 3; Affidavit of Attorney Arthur Ross, exhibits A & E. The project never got to the point where it was necessary to determine whether a waiver would be granted.