van Gestel, J.
This matter is before the Court on two motions pursuant to Mass.RCiv.P. Rule 56, one by the plaintiff, Liberty Mutual Insurance Company (“Liberty”), for partial summary judgment on all liability issues related to Counts One through Ten, Twelve and Thirteen of its Second Amended Complaint and Count III of the Counterclaims of the defendant, United Technologies Corporation (“UTC”), and a cross motion by UTC for partial summary judgment on Counts I-III of its Counterclaim and Counts One through Ten, Twelve and Thirteen of Liberty’s Second Amended Complaint.

BACKGROUND

The undisputed material facts that relate to both motions are as follows.
From 1975 through 1981, UTC purchased two general liability insurance policies from Liberty. Also, from 1976 through 1986, UTC purchased 25 workers’ compensation insurance policies from Liberty. All of these policies (collectively the “Liberty Policies”) were “occurrence” policies, pursuant to which Liberty was obligated to provide insurance for claims — whenever made — that are allocable to a particular policy year.
On both of the general liability policies and on 21 of the workers’ compensation policies, the named insured is UTC.[1] Both general liability policies also include a “Named Insured Endorsement” which lists other UTC subsidiarles — including the third-party defendant Essex Group, Inc. (“Essex”) — and the workers’ compensation policies similarly add other UTC subsidiaries, including Essex on 16 of the 25, as additional named insureds.
Each of the Liberty Policies included or incorporated by reference “Final Retrospective Premium Endorsements.” These endorsements, or rating agreements as they are sometimes called, setforth the manner by which the named insureds are obligated to pay premiums to Liberty. In all instances the rating agreement required the “named insured” to pay fixed annual premiums for each policy year according to the terms of the various policies. The rating agreements then provided for an annual calculation of “retrospective premiums” pursuant to a formula which takes into consideration claims paid (or in some instances, reserved for) on account of all insureds on an aggregate basis. Then, in a section entitled “Payment of Retrospective Premium,” the rating agreements provided:
After each computation [pursuant to the retrospective premium formula], if the premium thus computed exceeds the premium previously paid for the insurance subject to this rating agreement, the named insured shall pay the difference to the company; if less, the company shall return the difference to the named insured.
The rating agreements do not provide for the separate computations of retrospective premiums on a per insured basis.
Two of the Liberty Policies contain the following provision entitled “AGENCY AUTHORIZATION”:
United Technologies Corporation is authorized to act in behalf of all interests insured under this policy with respect to all matters pertaining to this insurance, including the giving and receiving of notice of cancellation, the payment of premiums and the receiving of return premiums, if any, and such dividends as may be earned and declared by the company.
*630 During the period that is covered by the Liberty Policies — from October 1, 1975 through October 1, 1986 — Essex was a subsidiary of UTC and, as stated above, was a “Named Insured” under the two general liability policies and 16 of the 25 workers’ compensation policies. During this same period, Essex was engaged in operations that posed long-term general liability, automobile liability, and workers’ compensation risks and brought numerous claims under the Liberty Policies.
On January 15, 1988, UTC, Essex, and MS/Essex Holdings, Inc. entered into a stock purchase agreementwhereby MS/Essex Holdings, Inc. purchased the stock of Essex, and Essex ceased to be a subsidiary of UTC (the “UTC/Essex Agreement”).
The UTC/Essex Agreement provided that Essex could continue to make claims under the Liberty Policies. Paragraph 5.16 of the UTC/Essex Agreement[2] is the controlling section on this issue. It reads:
Insurance. Seller [UTC] expressly recognizes the right of Buyer [MS/Essex Holdings, Inc.] and the Company [Essex] to make claims for coverage under the Seller’s [UTC’s] insurance policies after the Closing with respect to any events occurring prior to the Closing for which coverage is provided to the Company [Essex] under the terms and conditions of such policies.
Liberty was not a party to the UTC/Essex Agreement and, consequently, nothing therein had any effect on Liberty’s obligations to UTC or Essex as named insureds under the Liberty Policies or their obligations to Liberty in connection therewith.
Since the time that Essex was sold by UTC, Essex has continued to submit claims to Liberty relating to matters that occurred before the 1988 closing of the UTC/Essex Agreement, and Liberty has paid losses associated with those claims.
In all instances between 1977 and 2000, UTC either paid all retrospective premium invoices which were submitted to it by Liberty on the Liberty Policies, including premiums owed as a result of claims made by current or former UTC subsidiaries, or accepted all credits from Liberty, including those credits resulting from the claims experience of current or former UTC subsidiaries.
Internally, UTC charged Essex, and perhaps its other subsidiaries, for those portions of the retrospective premiums related to Essex’s claims. Even subsequent to UTC’s sale of Essex, UTC would continue to receive bills from Liberty that were categorized or broken down by UTC subsidiary, including Essex, and UTC would make payment to Liberty on these bills. As stated in Paragraph 15 of UTC’s concise statement of undisputed facts:
Accordingly, the [UTC] corporate accounts payable department would cut a check out of UTC’s corporate headquarters division to cover payment of the premium adjustments on behalf of UTC as well as its past and present subsidiaries including, among others, Essex. The corporate accounts payable department would then forward payment of the retrospective insurance premiums to Liberty Mutual.
Because of the sale of Essex in 1988, UTC, since that time, has not participated directly in the processing and settlement of claims made by Essex to Liberty for events occurring prior to 1988 but not learned about until after that date. Nevertheless, until 2000 UTC paid all billings from Liberty, including those that related to Essex claims.
From billings in 2000 forward, UTC has refused to pay Liberty in the previous manner. In April 2000, Liberty sent to UTC an invoice for retrospective premiums based on claims covered by UTC’s general liability and workers’ compensation policies for some of the policy years between 1976 and 1986. Net of certain credits, Liberty claims that the amount owed by UTC on that invoice was $1,571,025. Similar billings from Liberty to UTC in April 2001 and April 2002, have resulted, Liberty says, in amounts due for those two years respectively of $532,944 and $1,014,138.
While UTC has apparently paid some of the amounts due on the foregoing billings, Liberty claims that the amount still outstanding, including interest, is $2,247,107.[3]

DISCUSSION

Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The principal issue that must be examined is whether UTC, on the record before this Court, had and breached any premium-paying obligations under the Liberty Policies.
As it did in the discussion in the memorandum on the motion to dismiss the third-party complaint, the Court observes that it is concurrently considering the merits of these cross motions for summary judgment and Essex’s motion to dismiss the third-party complaint of UTC against it. The resolution of these Rule 56 motions will be grounded primarily on an interpretation of the Liberty Policies. By contrast, resolution of Essex’s Rule 12(b)(6) motion will be based on an interpretation of the UTC/Essex Agreement.
Here, there are dueling motions, such that both Liberty and UTC, although for quite different reasons, argue that there are no material facts in dispute and that, consequently, their respective motions should be allowed. Liberty claims that the Court can, and *631 should, rule in its favor, based solely upon an interpretation of the language of its Policies and the setting in which they exist. UTC makes essentially the same argument, but arrives at a different result.
The Court must look first at the language of the contracts between the moving parties. Those contracts are the Liberty Policies. If the answer can be found in those policies, then the Court should go no further in the absence of some basis to modify or change the requirements of the policies.
The Liberty Policies’ plain language becomes critical. The interpretation of an unambiguous agreement or policy is an issue of law for the Court. Policy language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A policy provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., supra, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of policy language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cos. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the [policy] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the policy as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
As quoted above from the Final Retrospective Premium Endorsement, in Section VIII thereof entitled “Payment of Retrospective Premium” there is a mandate that “if the premium thus computed [the retrospective premium] exceeds the premium previously paid for insurance subj ect to this rating agreement, the named insured shall pay the difference to the company [Liberty].” (Emphasis added.) This clearly and unequivocally means that the “named insured” shall make the payments.
Item 1 of the DECLARATIONS describes the “Name of Insured” as “United Technologies Corporation and as per policy provisions c/o R.G. Hugel, Insurance Department.” The address is stated to be “Hartford, CT 06101.” This address is that of UTC, not that of any of its subsidiaries, including Essex, which now at least, and probably at all material times, is and was located in Ft. Wayne, Indiana. The significance of the foregoing is that UTC is the principal named insured and, unless there is something else in the Liberty Policies or some later modification thereof agreed to by Liberty, it is, as between Liberty and UTC, UTC that is liable for the premiums, including any retrospective premiums that may become due for claims that fall within the coverage of the Liberty Policies.
Further, the Agency Authorization section quoted above, which appears only in the general liability policies, provides specific language authorizing UTC to act for all interests insured under the policy, including the payment of premiums. This does not mean, as UTC argues, that as between UTC and Liberty, UTC is merely an agent for Essex and its other subsidiaries. Clearly, Essex and its fellow subsidiaries are not principals controlling the actions of UTC.
The Liberty Policies contain no mechanism for separately collecting premiums from each of UTC’s subsidiaries; and the long history, including the 12 years after the sale of Essex in 1988, demonstrates no billing of, or payment by, any entity other than UTC. This is strong evidence of the parties’ actions under the policies and their understanding of how they should be interpreted.
UTC points to a decision out of the First Circuit Court of Appeals,[4] Over the Road Drivers, Inc. v. Transport Ins. Co., 637 F.2d 816 (1st Cir. 1980), as holding that a named insured is not jointly and severally liable for the payment of premiums under an insurance policy unless the policy specifically places that obligation on the named insured. UTC then argues that there is no such specific joint and several obligation in the Liberty Policies.
This Court, although not bound by Over the Road, nevertheless respects the court that rendered it. While the Court here agrees with the result reached in Over the Road, it reads the opinion’s reasoning as supporting, not defeating, Liberty’s position here.
The “critical issue” in Over the Road was “whether the seven companies insured . . . became jointly and severally liable for all premiums owing by any of them . . .” Id. at 818. The facts of Over the Road are different, in significant ways, from the facts here. There, each company was billed separately, each paid a premium based on information related specifically to it, each was separately required to pay retrospective premiums for its business, and each company “separately” received from the insuror an experience report.
Further, in Over the Road, in the part of the policy where the obligation to pay premiums by the “named insured” appears, the “Name of Insured” was defined as X Company “and/or” Y Company “and/or” Z Company, etc. The First Circuit found this to make ambiguous the issue of who was responsible for paying the premiums.
The Over the Road case — also significantly to this Court — was one in which the insuror, which owed a *632 return of retrospective premiums to one of the affiliated companies attempted to set off retrospective premiums due to the insurer from others of the affiliated companies. This was the context in which the question of joint and several liability was addressed.
Unlike the situation in Over the Road, there is no ambiguity here. The Policies say “the named insured” “shall pay," and UTC is the named insured. Nor was there in Over the Road a course of conduct like that between Liberty and UTC here. Conduct of parties to an agreement is an indication of their intent. Massachusetts Mun. Wholsale Elec. Co. v. Town of Danvers, 411 Mass. 39, 59 (1991). The “uncontested evidence of the [Liberty Policies’] content and the parties’ billing practices,” Over the Road, id., 637 F.2d at 820, n.4, lead to no other conclusion than that UTC is liable for all of the premiums. Nor does Liberty’s claims handling — as opposed to billing practices — with Essex post-1988 change the legal obligation of UTC to pay premiums.
There is a telling statement in Judge Campbell’s opinion in Over the Road. At p. 820 he discusses two cases, American Mutual Liability Insurance Co. v. Bollinger Corp., 402 F.Sup. 1179 (W.D.Pa. 1975), and Liberty Mutual Insurance Co. v. Petroleum Venture Capital Corp., 216 So.2d 925 (La.App. 1968), which he says suggest that common ownership of companies and a single individual’s role in procuring insurance suffice to establish joint and several liability. Judge Campbell then says:
In both these cases liability was imposed on one corporation for insurance premiums attributable to coverage of its subsidiaries or affiliates, when that corporation had procured the insurance coverage and had consistently been billed for and paid all premiums. The theory of these cases was not that the companies had assumed joint and several liability (which would have imposed an obligation on the subsidiaries and affiliates to pay premiums for the procuring company) but that there was an agreement, substantiated by a course of conduct, that one particular party would pay the premiums for all.
What Judge Campbell said about the Bollinger and Petroleum Venture Capital cases is essentially what is before the Court here: an agreement, substantiated by a course of conduct, that UTC would pay the premiums for all.
UTC, through the affidavit of one of its attorneys, Peter N. Mclsaac, has requested discovery pursuant to Mass.R.Civ.P. Rule 56(f). Mr. McIsaac states that “discovery that may prove relevant to the Court’s ruling on Liberty Mutual’s Motion has not yet been undertaken.” He reports that none of the parties has engaged in discovery to date. What Mr. McIsaac then suggests needs discovery is: (1) a “review [of] the hundreds of claims and related documentation that Essex has submitted to Liberty . . . since Essex was divested from UTC over 14 years ago; (2) whether Liberty ’’has engaged in a course of conduct demonstrating that it did not believe Essex and other parties under the ¡insurance policies at issue were jointly and severally liable"; and (3) that Liberty “is attempting to recover from UTC retrospective insurance premiums associated with a confidential settlement agreement that Liberty... entered into with Essex back in 1999.”
Mr. Mclsaac does not say in his affidavit that UTC has been unable to “present by affidavit facts essential to justify [its] opposition” to Liberty’s motion. Mass.R.Civ.P. Rule 56(f). See, e.g., Cullen Enterprises, Inc. v. Massachusetts Property Insurance Underwriting Association, 399 Mass. 886, 892 (1987). In any event, this Court sees the first and third items — Essex’s claims and the effect of some confidential settlement agreement — as, at best, relating to damages, which is not before the Court on Liberty’s motion. The second item — whether there was joint and several liability — relates to a legal issue on which UTC has in no way been hampered in making its opposition to Liberty’s motion.
The Court does not find that any Rule 56(f) discovery is necessary.

ORDER

For the foregoing reasons, Liberty Mutual Insurance Company’s Motion for Summary Judgment on all liability issues related to Counts One through Ten, Twelve and Thirteen of its Second Amended Complaint and Count III of United Technology Corporation’s Counterclaims is ALLOWED.
United Technologies Corporation’s Cross Motion for Summary Judgment is DENIED.
The parties are requested to confer and report to the Court on some suggested dates for a Rule 16 conference to consider scheduling of further aspects of this case.

On four of the workers’ compensation policies, which are said to be insignificant to the major issues raised by these cross motions, the named insureds are UTC subsidiaries other than Essex Group, Inc.

Also filed today is this Court’s determination on a motion to dismiss the third-party complaint brought by UTC against Essex. Some of the facts in the Background section of that memorandum are included here.

The Court is aware that Liberty’s motion seeks only partial summary judgment on liability issues. Thus, the Court reports these allegations by Liberty only to show that there is a claim for some amount due, not to establish in any way what that amount may be.

This Court disagrees with UTC’s contention that this decision is controlling in the circumstances of this case. Despite the close geography between the locus of the First Circuit Court of Appeals and the Suffolk Superior Court, the Supreme Judicial Court is the controlling court for this Court. And the Supreme Judicial Court and the First Circuit are not always in agreement. See, e.g., Hillis v. Lake, 421 Mass. 537, 545 (1995), wherein the SJC corrected a mistaken assumption by the U.S. Court of Appeals for the First Circuit in Bennett v. McCabe, 808 F.2d 178, 183-84 (1st Cir. 1987).