WILLIAMS REAL ESTATE CO., INC. *vs.* CC&F LINCOLN STREET LLC & another.[1]

No. 01-P-1724.

Suffolk. April 10, 2003. - October 22, 2003.

Present: LAURENCE, McHUGH, & COHEN, JJ.

*Practice, Civil,* Summary judgment. *Broker,* Commission. *Real Property,* Lease. *License.*

In a proceeding arising from a dispute between a real estate brokerage firm and a commercial landowner over a commission due under a written brokerage agreement, summary judgment on behalf of the brokerage firm was not warranted even though the participation of an unlicensed employee of the brokerage firm did not prevent the brokerage firm from seeking the commission to which the parties had agreed, since the unlicensed broker was not a party to the agreement, where the brokerage agreement itself was ambiguous in being susceptible of two commercially reasonable interpretations as to the landowner's obligation to pay the commission. [717-721]

CIVIL ACTION commenced in the Superior Court Department on December 22, 2000.

The case was heard by *Allan van Gestel,* J., on a motion for summary judgment.

*Stephen H. Oleskey* (*Peter J. Kolovos* with him) for the defendants.

*Jeffrey J. Upton* for the plaintiff.

COHEN, J. Before us is a dispute between the plaintiff, Williams Real Estate Co., Inc. (Williams), a real estate brokerage firm, and the defendant CC&F Lincoln Street LLC (CC&F), a commercial landowner, over a commission due under a written agreement. A judge of the Superior Court accepted Williams's interpretation of the agreement and granted its motion for summary judgment. Judgment entered for Williams, and CC&F

---

[1]Globix Corporation, reach and apply defendant.

appealed. We reverse and remand the case for further proceedings.

*Background.* We summarize the evidence contained in the summary judgment record, viewing it, as we must, in the light most favorable to the nonmoving party. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991).

Williams was one of three brokers involved in facilitating a deal between CC&F, as landlord, and Globix Corporation (Globix), as tenant, for the rental of a large commercial building located at 176 Lincoln Street in the Brighton section of Boston. Globix, a New York-based company, had retained Williams to locate rental space for its Internet hosting and connectivity business. Williams was based in New York but also maintained a corporate real estate license in Massachusetts.

Williams contacted a Massachusetts brokerage firm, Meredith & Grew, Inc., and the two companies reviewed available opportunities with Globix. When Globix became interested in CC&F's Lincoln Street property, Meredith & Grew contacted CC&F's broker, CB Richard Ellis — N.E. Partners, L.P. (Ellis). Negotiations in which all three brokers participated culminated in Globix and CC&F executing a lease on May 10, 2000.

Meanwhile, the brokers came to an understanding about their respective commissions. These arrangements were formalized when CC&F entered into separate, direct agreements with both Williams and Meredith & Grew, in addition to its "listing broker" agreement with Ellis.

The agreement between Williams and CC&F was signed on May 31, 2000, twenty-one days after CC&F and Globix executed the lease. This agreement provided that CC&F would pay Williams a commission on the following terms:

> "The brokerage commission will be calculated and payable as follows if the Lease is executed by both the Landlord and Tenant thereunder, but not otherwise (regardless of the reason why any such Lease is not executed):
>
> [$4.66 for each of the approximately 443,917 gross square feet of leased space.]

"Timing for payments:

> "Upon full execution and delivery of a Lease which is unconditionally binding on and enforceable against Landlord and Tenant: 50%

> "Upon Tenant commencing rental payments for the First Floor of the Building: 16 2/3%

> "Upon Tenant commencing rental payments for the Second Floor of the Building: 16 2/3%

> "Upon Tenant commencing rental payments for the Third Floor of the Building: 16 2/3%"

On June 7, 2000, the lease already having been signed, CC&F paid Williams $1,034,326.60, which was fifty percent of the total amount of Williams's commission. At that time, Williams employee Glenn Roberts signed a receipt prepared by CC&F that stated that "[t]he remaining payments will be due and payable upon occupancy of each floor by the tenant, Globix Corporation."

In the summer and fall of 2000, as CC&F worked on the extensive build-out required of it under the lease, the financial outlook for Internet-related businesses deteriorated suddenly, and Globix found it necessary to scale back its expansion plans. What was to be a lucrative arrangement for CC&F (Globix was to pay rent of over $14 million per year for fifteen years) never came to pass. Fearing that Globix would resort to bankruptcy unless it was relieved of its leasehold obligations, CC&F agreed to a termination agreement, pursuant to which Globix used its security deposit to make a payment of approximately $14 million to CC&F in return for the termination of the lease.[2] This occurred only seven months after the lease was signed. Globix never took possession of any part of the Lincoln Street building and never paid any rent.

Notwithstanding this turn of events, Williams maintained that it was entitled to the remaining fifty percent of its commission, interpreting its agreement with CC&F to mean that it had an unconditional right to receive its entire commission once the

---

[2]Over $4 million of this payment was a loan from Globix to CC&F, which CC&F was obliged to repay by December 21, 2002.

parties executed the lease. According to Williams, the provisions under the heading "Timing for Payments" merely established the dates that CC&F would be required to transmit portions of the commission and did not make those payments conditional.[3]

Accepting this construction of the agreement, and concluding, too, that there was no impediment to Williams suing for its commission even though the Williams employee involved in the Globix deal, Glenn Roberts, was not personally licensed in Massachusetts, a Superior Court judge granted Williams's motion for summary judgment.

*Discussion.* We begin with the threshold question of Williams's right to sue.

General Laws c. 112, § 87RR, as inserted by St. 1957, c. 726, § 2, provides, in relevant part:

> "[N]o person shall recover in any suit or action in the courts of the commonwealth for compensation for services as a broker performed within the commonwealth unless he was a duly licensed broker at the time such services were performed . . . ."

CC&F argues that this section bars Williams from recovering in a Massachusetts court a commission generated by the services of Roberts, who was not licensed in Massachusetts.[4]

The Superior Court judge rejected this argument, because Williams was acting solely on behalf of New York-based Globix and was "working through" a cooperating Massachusetts broker, Meredith & Grew. The judge therefore determined that Williams was not "practicing real estate" in Massachusetts and that neither Williams nor Roberts was required to be licensed in Massachusetts in order to share in the commission.

Even if we were inclined to conclude, as have some courts,[5] that an out-of-State broker need not comply with local real estate licensure requirements as long as the out-of-State broker

---

[3]Williams's position was not shared by the other brokers, including Meredith & Grew, which had an identically phrased contract with CC&F.

[4]Roberts was licensed in New York as a real estate salesperson.

[5]See, e.g., *Howell* v. *Steffey*, 204 A.2d 695 (D.C. App. 1964); *Furr* v. *Fonville Morisey Realty, Inc.*, 130 N.C. App. 541 (1998); *Bell* v. *United Farm Agency, Inc.*, 296 P.2d 149 (Okla. 1956).

works through a cooperating local broker, the facts do not support the application of such a rule to this case as matter of law. There is evidence in the summary judgment record that Roberts played a pivotal role in the negotiations. He was described in deposition testimony as "a substantial architect of the lease," involved "in all key meetings and negotiations." At many of these meetings, which were held in Massachusetts, Meredith & Grew's representative was not even in attendance. Thus, even if it were appropriate for us to recognize a cooperating broker exception to the Massachusetts licensing statutes,[6] Williams would not be entitled to summary judgment on the licensing issue on the ground that it had not independently practiced real estate in the Commonwealth.

Nevertheless, we reach the same result as the motion judge for different reasons — concluding that even if Roberts should have been licensed in Massachusetts, this lapse does not bar Williams from seeking to recover on its contract with CC&F. As the motion judge recognized, Williams and its employee, Roberts, did not perform brokerage services for CC&F — they acted solely on behalf of Globix. Moreover, all negotiations were completed, and the Globix lease was signed, three weeks before Williams and CC&F entered into their agreement. It appears that the agreement was made at the behest of CC&F, a sophisticated commercial real estate company. According to John Doherty of CC&F, in a case involving such a large commission, CC&F was "more comfortable" having the commission arrangements "understood directly with the tenant rep [*sic*] broker." Thus, CC&F elected to contract with Williams, not for the purpose of obtaining brokerage services, but to confirm what Williams would be paid as its share of the over-all commission for having represented Globix in the now-completed

---

[6]This issue might best be addressed by the Legislature, as has been done in various ways by other States. See, e.g., Ariz. Rev. Stat. § 32-2163(A) (2002) ("licensed broker in this state may pay compensation to and receive compensation from a broker lawfully operating in another state"); Okla. Stat. tit. 59, § 858-306(C) (2000) ("[a] broker who is duly licensed in another state . . . may enter a cooperative brokerage agreement with a licensed real estate broker in this state"); Tenn. Code Ann. § 62-13-302 (1997) ("[a] licensed broker may pay a commission to a licensed broker of another state if such nonresident broker does not conduct in this state any of the negotiations for which a commission is paid").

deal. By entering into a direct arrangement, CC&F could avoid any risks associated with having to rely upon the intermediate brokers to properly distribute the commission.

Significantly, Roberts was not a party to this agreement — it was made with Williams and executed by a Williams vice president on behalf of the corporate entity. And Williams, unlike Roberts, held a valid broker's license in Massachusetts at all relevant times.[7] In these circumstances, we decline to view G. L. c. 112, § 87RR, as preventing Williams from suing for the payment to which the parties agreed.[8] Cf. *Business Brokers Intl. Corp.* v. *Roderick*, 24 Mass. App. Ct. 957, 958 (1987) (given the "vector of considerations," a properly licensed corporate real estate broker could sue to recover its commission on the sale of a business and incidental real estate, even though its agent was not licensed as a real estate broker or salesman).

Precisely what was agreed remains a live issue, however; and notwithstanding the efforts of both parties to draw dispositive conclusions in their favor from the seminal brokerage agreement case of *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622 (1975),[9] the issue ultimately reduces itself to a question of contract interpretation. We do not share the motion judge's view

---

[7] Williams had held a Massachusetts corporate license since 1990. As required by law, a Williams officer also was licensed as a broker in the Commonwealth. See G. L. c. 112, § 87UU. We do not attach significance to the fact that six months after the agreement between CC&F and Williams was executed, Williams's corporate license became "not in good standing." To sue for a commission, the statute requires only that the broker be duly licensed at the time that the services were performed. G. L. c. 112, 87RR.

[8] We express no opinion as to whether Roberts's role in the transaction could give rise to other sanctions. See G. L. c. 112, §§ 87AAA, 87CCC.

[9] In the context of real estate sales, *Tristram's Landing* announced the rule that a broker becomes entitled to recover a commission only if (a) the broker "produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract." 367 Mass. at 629. The underlying assumption of this approach is that payment of the commission will come out of the proceeds of the sale. How this translates into the leasing context is hotly disputed here, with CC&F arguing that absent clear agreement to the contrary, a commission on a lease is only due when rent commences to be paid, and Williams arguing that the commission is earned when the tenant "consummates the leasehold relationship" by executing the lease. Whatever the appropriate default rule, however, these two experienced and knowledg-

that the brokerage agreement unambiguously provides that CC&F's obligation to pay the entire commission arose unconditionally when Globix and CC&F executed their lease. Although that is one way to read the agreement, it is also susceptible of a different interpretation — that while fifty percent of the commission was due and payable when the lease was signed, the remaining installments were conditioned on the tenant commencing rental payments for various parts of the building.

The agreement states that "[t]he brokerage commission will be calculated and payable *as follows* if the [l]ease is executed . . ." (emphasis added). What "follows" are clauses specifying that certain percentages of the commission are payable "upon" the happening of certain events, i.e., the commencement of rental payments on successive portions of the building. The word "upon" may simply signify timing (that an action should take place immediately after the specified event); but "upon" also may connote a condition (that an action should take place when and if the specified event occurs).

Either interpretation would be commercially reasonable. As observed in a resource for practitioners:

> "[When marketing commercial leaseholds t]he listing agreement should specify when the commission will be payable. The broker, of course, wants the commission payable as soon as possible and can be expected to request the commission to be paid in full upon lease execution. The broker's argument for this position is that it has been hired simply to get the tenant to enter into the lease and not to ensure the tenant's performance of its obligations under the lease. If a tenant executes a lease and subsequently fails to perform, the broker will argue, the landlord has its legal remedies for breach of contract. The landlord may reply that it has hired the broker not simply to produce a contract but to produce a rent-paying tenant. Accordingly, the landlord will not want to pay a commission until the tenant has taken occupancy of the premises and commenced to pay rent. A common compromise calls for 50

---

able parties addressed the issue in their contract, and it is the intent of their agreement that controls.

percent of the commission to be payable upon lease execution and 50 percent upon the tenant taking occupancy and commencing to pay rent."

1 Donovan, Residential and Commercial Landlord-Tenant Practice in Massachusetts § 2.2.2 (MCLE 2001). As it is not possible to tell from the parties' ambiguous agreement which approach was intended, the dilemma must be resolved after full consideration of relevant extrinsic evidence.[10] The judgment is therefore reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.[11]

*So ordered.*

---

[10]In opposition to Williams's motion for summary judgment, CC&F submitted evidence of the custom and practice in the greater Boston commercial leasing business and of the other brokers' understandings of the commission arrangements. Because the motion judge concluded that the brokerage agreement unambiguously supported Williams's position, he did not consider these submissions.

[11]We have considered and we reject Williams's subsidiary argument that, regardless of the interpretation of the agreement, CC&F could not deprive Williams of its commission by entering into the termination agreement with Globix. In order to recover a commission on a failed transaction, a broker must show wrongful conduct on the part of the real estate owner which undermines the transaction's completion. See *Hillis* v. *Lake*, 421 Mass. 537, 542 (1995). Whether CC&F can be said to have acted wrongfully in entering into the termination agreement cannot be resolved as matter of law on the summary judgment record.