Curtin, J.
Oxford Business Brokers, Inc. (“Oxford”) commenced this action to recover for the defendant’s alleged breach of a listing agreement and violation of G.L.c. 93A in failing to proceed with the sale of her liquor store to a buyer allegedly *225 ready and able to complete the transaction. The trial court first allowed Oxford’s Mass. R. Civ. E, Rule 56, motion for partial summary judgment on its breach of contract claims, then held an evidentiary hearing on a salient issue of fact necessary for proof of the defendant’s liability, and then found in favor of Oxford on Counts I and II of its complaint for breach of both an express and an implied contract. Oxford was awarded $20,000.00 in damages for a commission, plus attorney’s fees, interest and costs. The defendant filed this Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal.[1]
In support of its motion for partial summary judgment on its contract claims, Oxford submitted affidavits by its broker, Leon G. Spink, III (“Spink”), by the prospective purchaser, Stephanie Browne (“Browne”), and by its attorney, as well as selected portions of the defendant’s deposition. Viewed in the light most favorable to the defendant, Giovanella v. Conservation Comm’n of Ashland, 447 Mass. 720, 731 (2006); Imprimis Investors, LLC v. KPMG Peat Marwick LLP, 69 Mass. App. Ct. 218, 222 (2007), Oxford’s summary judgment materials indicate that on April 13, 2005, defendant Mary Moriarty (“Moriarty”) signed a “Sole and Exclusive Listing Agreement” (“Listing Agreement”) with Oxford for the sale of Canton Liquor & Wine at a price of $150,000.00.[2] The following paragraphs of the preprinted form Listing Agreement presented by Oxford to Moriarty for her signature are relevant here.
1. Seller agrees to pay Broker as compensation for services a fee of 10 percent of selling price, but no less than the sum of $7,500. Upon broker procuring a purchaser during the listing period within the terms and conditions specified herein or any other price, terms and conditions acceptable to Seller, said compensation to be paid at closing (punctuation errors in original).
5. If Seller refuses or is unable to comply with the listing terms for any reason, thereby preventing the sale of the business, the commission shall become immediately due by the Seller to the Broker.... (emphasis supplied).
6. Seller also agrees that once the Seller has entered into a Purchase and Sale Agreement with a buyer, the Broker shall have no obligation to present further offers to the Seller or continue marketing the business.
9. In the event of the breach of this agreement by Seller, Seller shall pay the Broker the actual amount of any cost and legal fees incurred by Broker for legal consultation or representation arising therefrom in addition to any other relief which Broker may be entitled to obtain (emphasis supplied).
The remaining paragraphs of the Listing Agreement, or the “listing terms,” required Moriarty, as seller, to grant exclusive brokerage authority to Oxford for nine months; to pay Oxford a commission upon the sale or other disposition of the liquor store by another broker during the listing period, or to a buyer introduced by Oxford within 12 months of the expiration of the Listing Agreement; to assure the accuracy of all business information provided to Oxford; and to acknowledge her receipt and *226 reading of the Listing Agreement.
Browne allegedly approached Oxford in early June, 2005 about the liquor store sale. On June 6, 2005, Browne executed a standard form “Confidentiality Agreement” as a basis for her review of the store’s proprietary financial and operational information. Two days later, Browne signed a “Confidential Receipt of Information” form acknowledging her receipt of information from Oxford relative to the store purchase. In executing the form, Browne agreed to keep confidential the information provided to her and to “undertake a [sic] careful and diligent research” of all aspects of the business that was for sale. On June 14, 2005, Browne signed a written “Offer to Purchase” (“Offer”) the liquor store for $200,000.00, an offer $50,000.00 more than the asking price for the business. Moriarty played no role in negotiating the terms of the Offer, which was laden with buyer contingencies and seller responsibilities.
On the same day, June 14,2005, Spink appeared at the liquor store and presented Browne’s Offer to Moriarty for her signature. Moriarty testified in her deposition that she told Spink that she wanted to meet Browne and to have her execute a confidentiality statement before Moriarty released any business information. Spink replied that Browne was too busy to meet with Moriarty at that time. He did not reveal that Browne had already signed a confidentiality agreement and been given information about the store. Nor did he show, or provide a copy to, Moriarty of the $1,000.00 deposit allegedly paid by Browne to bind the Offer. Moriarty also told Spink that she was about to close the liquor store for a few weeks to attend to her daughter who was in the final stages of a difficult pregnancy, and to take a vacation. Spink did not advise Moriarty that the performance dates he and Browne had set for execution of a purchase and sale agreement and various contingencies coincided with the very dates Moriarty would be away. Despite the lack of any response from Spink to her questions and concerns, Moriarty signed the Offer.
The Offer required Moriarty, Browne and their attorneys to review and accept a “mutually satisfactory” purchase and sale agreement by July 20,2005, and specified a closing date of September 15, 2005. Moriarty, as seller, was obligated to warrant that she held clear and marketable title and that all store equipment would pass inspection, and to deliver a valid lease or assignment of her lease of the premises on terms satisfactory to Browne. An addendum to the Offer listed additional contingencies permitting Browne to withdraw her offer and recover her deposit, including her inability to obtain financing by August 1,2005 and her inability to obtain any or all of the liquor, tobacco and lottery sales licenses required for the business. Further, the “conditions” of Browne’s Offer included the following:
Review and acceptance of all financial information including: canceled checks, sales slips invoices and tax returns. This contingency will be completed within two week [sic] of being presented info.
When Moriarty, who was on vacation, did not provide the specified financial documents within two weeks of the Offer, Browne agreed with Spink to extend the “deadlines referenced” in the Offer to August 3, 2005 and the closing date to September 29,2005. There is no evidence that Moriarty was ever informed of these extensions. Spink averred that he had made many unsuccessful attempts to contact *227 Moriarty between June 14, 2005 and July 20, 2005. Moriarty testified that the only message from Spink waiting for her upon her return from vacation was a letter mailed on July 25,2005, in which Spink claimed that Moriarty’s failure to respond to his “numerous messages” indicated that she was unable to comply with the Listing Agreement and Offer. Spink’s letter did not advise Moriarty that Browne’s offer had been extended and, thus, was still a viable offer to which she could respond. Moriarty did not respond. On August 3, 2005, Browne withdrew her offer citing Moriarty’s failure to produce the nonexistent tax returns and other financial documents, and Oxford returned her deposits. Oxford then commenced this suit to recover a $20,000.00 broker’s commission, attorney’s fees and costs for its services during the seven-week lifespan of Browne’s unsuccessful Offer.
1. Count I of Oxford’s complaint alleged that Moriarty’s failure to provide the financial documents for Browne’s review constituted a breach of contract, entitling Oxford to recover a full commission on the failed transaction. The trial court’s allowance of partial summary judgment in favor of Oxford for breach of an express contract constituted reversible error.
Both parties agree that the general rule in this Commonwealth is that a broker is entitled to a commission only when (a) he produces a buyer ready, willing and able to purchase on the seller’s terms, (b) the buyer contracts with the seller to do so, and (c) the buyer completes the transaction by closing the sale. Tristram’s Landing, Inc. v. Wait, 367 Mass. 622, 629 (1975). A rational, integrated reading of paragraphs 1 and 6 of the parties’ Listing Agreement in this case indicates that the agreement incorporated the Tristram’s Landing rule. Pursuant to those provisions, Oxford was obligated to produce a buyer or buyers to purchase the liquor store on Moriarty’s terms until a purchase and sale agreement was executed, and Moriarty agreed to pay Oxford’s commission at the closing. In the absence, therefore, of a purchase and sale agreement and a closing of the transaction, no commission was due and payable.
Oxford correctly argues that the Tristram’s Landing prerequisites to the payment of a broker’s commission may be contractually varied by the parties. Lewis v. Emerson, 391 Mass. 517, 524-525 (1984). The contractual provision utilized, however, must be sufficiently clear and specific as to the seller’s potential liability for a commission short of a closing. See Plymouth Port, Inc. v. Smith, 26 Mass. App. Ct. 572, 575 (1988). The provision “must be made... with enough specificity to alert the seller to the situations in which he can be liable for a broker’s commission even if a sale is not consummated” (emphasis supplied). Coldwell Banker/Hunneman v. Shostack, 62 Mass. App. Ct. 635, 638 (2004), quoting Currier v. Kosinski, 24 Mass. App. Ct. 106, 107 (1987). Oxford contends, erroneously, in its brief that it was Moriarfy’s obligation to protect herself contractually from payment of a commission in the preclosing, pre-purchase-and-sale-agreement circumstances of this case. Instead, it was Oxford who was “in a better position than the seller” to insert an “explicit provision” in its brokerage agreement varying the Tristram’s Landing rule. Plymouth Port, Inc., supra at 575. Thus,
[t] o hold a seller liable for a commission even if a sale is not consummated, the broker must be the one to alert the seller with a provision of “enough specificity.” This burden is placed on the broker even when the negotiations are conducted by a sophisticated investor and not by an “uninitiated prospective seller” (citations omitted).
*228 Id. Any broker’s provision altering the Tristram’s Landing rule must be “scrutinized carefully. If not fairly made, such agreements may be unconscionable or against public policy.” Coldwell Banker/Hunneman, supra at 638, quoting Tristram’s Landing, supra at 630.
Oxford claims, incorrectly, that para. 5 of the Listing Agreement was sufficient to take this case out of the Tristram’s Landing rule and to entitle it as a matter of law to a commission despite the absence of a closing, or even a purchase and sale agreement Paragraph 5 reasonably alerted Moriarty to her liability for a commission only if her refusal or inability to “comply with the listing terms” prevented the sale of the liquor store. Oxford has failed to identify a single provision of the Listing Agreement, i.e. the listing terms, with which Moriarty did not comply. Instead, Oxford points to Moriarty’s failure to comply with implicit requirements of the Offer, an agreement between Moriarty and Browne only, to which Oxford was not a party.[3] There is nothing in the Offer to Purchase, or in the Listing Agreement, which integrated those separate contracts. The Listing Agreement did not encompass, or even reference, future offers as “listing terms.” Nor did it contain any specific language obligating Moriarty to proceed with purchase offers as a term, or requirement, of the Listing Agreement, or render her failure to do so a breach of that agreement While it could be reasonably argued that Moriarty’s agreement to sell the business implied an agreement to satisfy the requirements of any contract preliminary to a purchase and sale agreement, the Listing Agreement did not so provide. As the case law indicates, the burden was on Oxford to state clearly in its brokerage agreement the specific situations in which a commission would become due short of an actual sale of the liquor store. Thus, as para. 5 covered only a breach of the Listing Agreement itself, Oxford’s failure to advance any evidence of Moriarty’s breach of the stated listing terms should have resulted in the denial of Oxford’s Mass. R. Civ. E, Rule 56, motion on Count I of its complaint.
2. Following the summary judgment hearing, the judge instead made “findings” that Moriarty had “breached the contract” by foiling to provide financial documents to Browne, and allowed Oxford’s motion for partial summary judgment “in part.” Despite also finding that Oxford had “found a bona fide buyer,” the judge concluded that the “only real factual dispute” was whether Browne would have qualified for financing. The judge ordered an evidentiary hearing to determine if the “buyer’s contingency was easily attainable and not a hindrance to completion of the sale,” and suggested that Oxford introduce expert testimony to establish Browne’s financial qualifications.
First, as noted, Oxford failed to satisfy its Rule 56 affirmative burden, Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989), of demonstrating that Moriarty had breached the Listing Agreement; and its motion for partial summary judgment for liability on Count I should have been denied and summary judgment entered in favor of *229 Moriarty. Second, findings of fact are “‘antithetical’ to summary judgment which, by definition, is an ultimate ruling of law upon undisputed facts.” Carter v. Seto, 2005 Mass. App. Div. 62, 64, quoting Cruickshank v. Commerce Ins. Co., 2004 Mass. App. Div. 103, 104. It is error for a judge to engage in fact finding in deciding a summary judgment motion. Riley v. Presnell, 409 Mass. 239, 244 (1991); Carter v. Lynn Hous. Auth., 66 Mass. App. Ct. 117, 122 (2006). Once the court identified a material issue of fact, summary judgment should have been denied. Instead, the court allowed Oxford’s motion for partial summary judgment on liability “in part” by ruling as a matter of law that Moriarty was liable for breach of contract, and then ordered an evidentiary hearing on an element of proof necessary to establish that liability.
Having Med to prove breach of an express contract, Oxford had to resort to its alternative theory that it was entitled to a commission under the second exception to the Tristram’s Landing rule applicable when “the failure of completion of the contract results from the wrongful act or interference of the seller.” Id. at 629. That claim was set forth, arguably, in Count II of Oxford’s complaint for breach of an implied contract. Oxford’s recovery on that theory required proof not only of wrongful or bad faith conduct by Moriarty that actually prevented the sale, but also of Oxford’s production of a buyer ready, willing and able to purchase on Moriarty’s terms, Bump v. Robbins, 24 Mass. App. Ct. 296, 307 (1987), and of a contract of sale binding on both Moriarty and that purchaser. Capezzuto v. John Hancock Mut. Life Ins. Co., 394 Mass. 399, 403 (1985). The question of whether a buyer qualifies as one ready, willing and able to purchase is generally one of fact[4] See Gaynor v. Laverdure, 362 Mass. 828, 830-831 (1973).
3. The evidentiary hearing ordered by the court focused on Browne’s financial qualifications. Despite the judge’s express recommendation, Oxford failed to introduce expert testimony on that issue. Browne testified that she never made a single application for financing, or even decided whether she would have sought either a personal, or a business, loan to purchase the store. As to the possibility of the former, her testimony fell short of clearly establishing that her own assets afforded her a sufficient income-to-debt ratio to qualify for personal financing for the, full $180,000.00 balance of the purchase price.[5] Nor did a preponderance of the evidence *230 demonstrate the likelihood of Browne obtaining a commercial loan on the liquor store.[6] Browne also testified that she never even began the process of applying to any of the government agencies authorized to issue the multiple licenses required to operate the liquor store. Oxford offered no evidence about the application processes and requirements, or the likelihood of Browne obtaining any, or all, of the required licenses.
With respect to the legitimacy of Browne’s offer, Moriarty testified that no person named Browne could be located at either the address, or the telephone number, provided to her by Spink, and that Spink had refused even to show Moriarty a copy of the initial $1,000.00 deposit allegedly paid by Browne to bind her offer to purchase. Moriarty also testified that Spink was well aware that she would be away and the liquor store closed during the period of time Spink and Browne had specified for performance of the offer to purchase requirements; that no messages from Spink were waiting for her upon her return to the store; that Spink knew that the tax returns he and Browne specifically included in the list of documents to be produced did not exist;[7] that she was unaware of Browne’s unilateral extension of the Offer; and that the first communication received from Spink after Browne’s offer was his July letter.[8] Spink did not testify at the hearing.
In an apparent effort to establish that Browne’s failure to take even the most preliminary steps to proceed with the sale was not attributable solely to Moriarty’s failure to provide financial documents, Moriarty’s counsel attempted to question Browne about the liquor store information she received from Spink prior to her execution of the Offer. Browne had, in fact, signed a written acknowledgment of her receipt of such information. The judge allowed Oxford’s objection to that line of inquiry based on his prior, erroneous partial summary judgment ruling of Moriarty’s breach of contract. The court’s evidentiary ruling was error. It is elementary that “all relevant evidence is admissible unless within an exclusionary rule.” Vigorito v. Ciulla Bldrs., Inc., 57 Mass. App. Ct. 446, 454 (2003), quoting Poirier v. Plymouth, 374 Mass. 206, 210 (1978). The contingency clause at issue permitted Browne to withdraw her offer for any reason after her review of the liquor store’s financial documents. While it was undisputed that Moriarty did not furnish business documents to Browne during her absence from the store, that omission may have had less of an impact on the transaction and its failure if Browne was already in pos *231 session of whatever financial records existed at the time. The question of what Browne received from Oxford was clearly relevant, and should have been allowed.
After the hearing, the trial judge issued additional findings that Browne was a bona fide buyer capable of “financially” completing the liquor store purchase and, once again, ordered judgment for Oxford on Counts I and II of its complaint for breach of both an express and an implied contract. In rejecting Oxford’s G.L.c. 93A claim, the judge essentially found that Moriarty’s “noncompliance” was not unfair or deceptive, much less wilful or intentional. Absent from the hearing or any of the court’s findings was an indication of proper consideration of the dispositive issue on Oxford’s alternative claim for recovery, namely, whether Moriarty’s omissions constituted the nature and degree of the wrongful or bad faith conduct that directly causes the failure of a transaction and that justifies a broker’s recovery of a commission. Bonin v. Chestnut Hill Towers Realty Corp., 392 Mass. 58, 70-71 (1984). See, e.g., Donovan v. Lobosco, 30 Mass. App. Ct. 53, 56 (1991) (recovery by broker where seller prevented completion of sale to take advantage of higher offer). See generally Hillis v. Lake, 421 Mass. 537, 542543 (1995) (seller’s bad faith or wrongful conduct required).
The trial court’s judgment for the plaintiff on Counts I and II of its complaint is vacated. Summary judgment shall be entered in favor of the defendant on Count I for breach of an express contract, and this action is returned to the Framingham Division of the District Court Department for a trial on the merits on the plaintiffs claim for breach of an implied contract under Count II. The court’s judgment in favor of the defendant on Count III (G.L.c. 93A) is to stand.
So ordered.

 As Oxford did not appeal the trial court’s judgment for the defendant on its G.L.c. 93A count, that judgment stands.

 The liquor store is owned by TMJ Enterprises, Inc., of which Moriarty is, apparently, the sole officer and stockholder.

 Oxford did not sign the Offer and is not listed as a party to that agreement. There are three references in the Offer to the “broker.” One states that the broker is not authorized to give legal advice. The second, in the addendum to the Offer, disclaims any broker liability resulting from a hazardous material inspection by Browne. The third imposes joint and several liability on both Moriarty and Browne for the broker’s expenses and attorney’s fees incurred in connection with any lawsuit “to collect any sum due the Broker.”

 The only evidence offered on that issue consisted of Browne’s conclusory, albeit unrebutted, averments, in support of Oxford’s summary judgment motion, that she had sufficient financial resources to pay the purchase price; and that she was qualified at least to apply for the numerous licenses (liquor, tobacco, food establishment and lottery) necessary to run the liquor store simply because she was a U.S. citizen who had not previously held such licenses. In ordering an evidentiary hearing, the trial court obviously deemed these conclusory assertions insufficient.

 Browne claimed a combined net worth with her husband (who was not participating in the purchase of the liquor store) of approximately half a million dollars, consisting of cash on hand in a joint bank account, retirement accounts, and three properties. However, all of the Brownes’ real estate was heavily mortgaged, with two mortgages alone on their principal residence. They also had $40,000.00 in credit card debt, and Stephanie Browne had already borrowed against a modest retirement account. There was no evidence of her household or personal expenses, or of the taxes or other carrying costs for the real estate.

 She testified that she was an administrator at Blue Cross/Blue Shield, and had no business or retail sales experience, much less any experience in the liquor industry. Browne claimed to have simply responded to Oxford’s internet advertisement for the liquor store, and to have readily agreed, without even an inspection of the store, to buy the business for $50,000.00 more than the asking price. There was no evidence that Browne had prepared a business plan in preparation for commercial financing approval. Moreover, Moriarty testified that the business had not shown a profit in years.

 Moriarty stated that she had obtained extensions for filing the tax returns.

 Browne was not asked if she knew Spink prior to her response to Oxford’s internet posting. In any event, no defense or counterclaim for fraud was included in Moriarty’s answer.